## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF OKLAHOMA

GARY CLARK,                                    )
                                               )
         Plaintiff,                      )
                                               )
v.                                             )    Case No.:  16-CIV-115-JHP
                                               )
ROBERT COLBERT, in his                         )
official and individual capacities             )
as Sheriff of Wagoner County,                  )
Oklahoma; et al.,                              )
                                               )
         Defendants.                     )

## OPINION AND ORDER

Now before the Court is the Motion for Summary Judgment of the Defendant Robert Colbert [Dkt. # 104].  Plaintiff Gary Clark brought this action pursuant to 42 U.S.C. § 1983 alleging violations of his constitutional rights. Plaintiff has also asserted a state law negligence claim against Colbert. Defendant Colbert contends that he is entitled to summary judgment on all claims asserted by the Plaintiff.  After consideration of the pleadings, affidavits, and briefs, the Court  grants Defendant Colbert's Motion for Summary Judgment on all claims asserted by the Plaintiff.

## BACKGROUND

### A.  Procedural History

Plaintiff commenced this action on April 4, 2016, by filing his Complaint.   [Dkt. # 3] On that same day, Plaintiff filed his Amended Complaint.  [Dkt. # 4]   On January 5, 2017, Defendant Robert Colbert filed his Motion for Summary Judgment on all claims asserted by Plaintiff.  [Dkt. # 104]

### B. Factual Background

The Court determines that the following facts are either not specifically controverted by the Plaintiff, are not subject to genuine dispute, or are stated in the light most favorable to the Plaintiff.

Plaintiff Gary Clark ("Clark") was diagnosed with schizophrenia approximately 20-30 years ago. Over the years, Clark's brother, Larry Clark, participated in caring for Clark. By the summer of 2014, Larry had built a small shed behind Larry's residence, and allowed Clark to live in the shed. As shown by the record, the shed is located in a large backyard area with no fencing between Larry's property and adjoining residential areas.

In the days leading up to August 18, 2014, Larry observed that Clark was behaving erratically. Larry was concerned and suspected that Clark had not taken his psychotropic medications. On August 18, 2014, Larry Clark went out to the shed and knocked on the door. When the door opened, Larry Clark saw that Clark was in the doorway of the shed and had a large knife in his hand. Clark used the knife to make contact with Larry Clark's abdomen, causing a small cut.

Larry Clark retreated from the shed, returned to his home, and called 911. Larry reported that he had been assaulted by his brother, and that Gary had charged and lunged at Larry with a knife. The dispatcher logged the call as "domestic violence" and noted that "Gary Clark had assaulted [Larry Clark]" and "tried to stab him with a knife."

Deputies Robbie Lively and Jason Hathcoat of the Wagoner County Sheriff's Office ("WCSO") were the first to arrive on scene. When they arrived, they spoke with Larry and looked at his cut. Larry told them that Clark was upset and had cut Larry with a knife. Deputies Lively and Hathcoat went around the house toward the backyard shed. By this

time, Clark was standing on the small porch immediately in front of the shed, holding a knife and looking mad. The officers observed that the knife was a large, butcher-like knife, approximately 10-14 inches long.

WCSO Deputies Lively and Hathcoat stood at a distance from Clark and identified themselves as law enforcement. Clark made no verbal response, but made gestures at the officers with his hand shaped like a gun, flipped them off with his middle finger, and used his hand to motion them to come closer. Lively and Hathcoat asked Clark to put the knife down and talk with the officers, with no success. Clark's hand gestures, including extending a finger in an obscene gesture towards the officers, continued.  Hathcoat and Lively radioed for supervisors to come to the scene. While the officers waited for supervisors to respond, Clark continued making hand gestures, which the officers interpreted as threatening.

Approximately six minutes after WCSO Deputies Hathcoat and Lively arrived on scene, the WCSO deputies requested the nearby Broken Arrow Police Department ("BAPD") to also respond to the scene to provide assistance in dealing with Clark. The Deputies understood that the Broken Arrow Police Department had access to "less lethal" alternatives, including tasers, pepper ball launchers, batons, a canine, and a ballistic shield.

While waiting for the arrival of BAPD officers, the WCSO Deputies remained about 20-30 feet away from the porch area because they believed Plaintiff posed a risk of harm to the officers and could leave the porch at any time armed with the knife.  While waiting for the BAPD, another WCSO deputy, Major Dustin Dorr, arrived on scene and approached Clark.  Major Dorr approached Clark and told him that he was under arrest and asked Clark to put the knife down. Clark neither complied, nor verbally responded to the command.

3

Approximately thirty minutes after WCSO Deputies Hathcoat and Lively arrived on scene, Captain Patrick Dufriend of the BAPD arrived on scene, was briefed on the situation and directed the officers to continue attempting verbal commands to try to persuade Clark to drop the knife.  Captain Dufriend was also concerned that Clark could leave the porch at any time.  Other officers from the BAP arrived on scene.

After Captain DuFried arrived, Wagoner County Sheriff Bob Colbert arrived.  Clark remained on the porch with the knife, gesturing at the officers with his hands and running his hands along the knife blade, looking at the officers.  Sheriff Colbert was briefed by officers on the scene, including Captain DuFriend.  At this point, Sheriff Colbert told Dufriend to "do what you got to do."

Captain DuFriend understood that Sheriff Colbert gave DuFriend the authority to create a plan to deal with Clark.  BAPD Captain Dufriend then formulated a plan to approach Clark, get the knife out of his hands, and arrest Clark. Captain DuFriend directed the BAPD officers to form a line, with Captain DuFriend in the front with a ballistic shield, followed by BAPD Sgt. Blevins armed with a pepper ball launcher; and BAPD Officers Wylie and Gibson armed with tasers.  BAPD Officer Keech was also present with a canine.  BAPD Officer Smith was positioned with an AR-15 rifle on the back porch of the Larry Clark residence, facing the shed.  WCSO deputies Lively and Hathcoat stood off to the side with side arms to provide lethal coverage. Captain DuFriend's plan was to strike Clark with pepperballs to cause Clark to drop the knife in order to secure the scene for the safety of officers and others.

Before approaching Clark, the officers on the scene had repeatedly told Clark he was under arrest and to put the knife down. When Clark still did not drop the knife, Captain

DuFriend and the BAPD officers advanced toward Clark. Captain Dufriend directed BAPD Officer Blevins to deploy the pepper ball launcher. The pepper ball launcher, similar to a paint ball gun, launches pellets filled with pepper powder that burst upon impact. Sgt. Blevins shot a group of pepper balls at Clark.  Clark was hit with pepperballs with no apparent effect on Clark's behavior.  Clark remained on the porch with the knife in hand. Captain Dufriend ordered Sgt. Blevins to deploy another volley of pepper balls at Clark.

After delivering two volleys of pepperballs, Captain Dufriend directed the group of officers to withdraw from the shed so they could regroup. As the officers backed away, Clark stepped off the porch and advanced toward the officers, still with the knife in his hand.  In response to Plaintiff's rapid advance towards the officers, the line of officers began to fan out away from Clark.  BAPD officers Wylie and Gibson deployed their tasers at Clark.  When the tasers had no effect and Clark continued moving toward the officers with the knife still in hand, shots were fired, striking Clark.  Deputies Hathcoat and Lively, and Broken Arrow Officer Smith fired their weapons at Plaintiff. Clark fell to the ground two or three feet from the officers. Clark dropped the knife, and was transported to the hospital.

After the shooting, Sheriff Colbert spoke with the media about the situation. He advised the media that the officers had "tried everything they could do that's less lethal." Sheriff Colbert also stated that "two or three different negotiators [tried] to talk to him, but it just wasn't happening," and that Plaintiff "broke and charged at the officers." Sheriff Colbert advised that the officers deployed non-lethal pepper balls, tasers, and firearms at Plaintiff when he was within feet of the officers.

Clark was charged with Assault and Battery with a Dangerous Weapon, and Assault with a Deadly Weapon.  After a preliminary hearing, the District Court of Wagoner County

found that probable cause existed for criminal charges, and Clark was bound over for trial. Ultimately, the charges against Clark were dismissed because of his schizophrenia.

## DISCUSSION

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–323 (1986); *Anderson v. Liberty Lobby, In*c., 477 U.S. 242, 250 (1986); *Kendall v. Watkins*, 998 F.2d 848, 850 (10th Cir. 1993).  Fed. R. Civ. P. 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp*, 477 U.S. at 322. A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable jury could return a verdict for either party. *Anderson*, 477 U.S. at 248.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury, or whether it is so one-sided that

the party must prevail as a matter of law." Id. at 251–252.  In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. *Garratt v. Walker*, 164 F.3d 1249, 1251 (10th Cir. 1998).

In order to survive summary judgment, a plaintiff "must go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to that party's case." *Serna v. Colorado Dep't of Corr.*, 455 F.3d 1146, 1151 (10th Cir. 2006) (internal quotation marks omitted). "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.' " *Celotex*, 477 U.S. at 327.

### A.  Excessive Force Claim

Clark asserts that the officers used excessive force in violation of the Fourth Amendment, and that Defendant Colbert "either caused or created a situation that necessitated an escalation of the need to use more force than what was necessary." [Amended Complaint, ¶ 59]. Clark specifically claims the use of the pepper ball launcher would predictably agitate a person with mental health issues causing them to leave their contained position and "act irrationally in the direction of law enforcement…"  [Amended Complaint, ¶ 57].  However, before addressing the issue of whether or not Defendant Colbert can be liable for the actions of the BAPD officers, it must first be determined whether or not excessive force was used against Clark in violation of the Fourth Amendment.

Under the undisputed facts of this case, the decision of the Broken Arrow Police Department to use the pepperball launcher on Clark was not a use of excessive force in

violation of the Fourth Amendment. Likewise, once Clark left the porch and charged the officers with a raised knife, the officers did not use excessive force when they shot and wounded Gary Clark as he advanced towards the officers.

In evaluating objective reasonableness, the Supreme Court instructs courts to consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Here, officers had been informed that Gary Clark had been behaving erratically. Larry Clark had informed the dispatcher that Clark had "assaulted" him, and "tried to stab him with a knife." In the presence of the officers, Clark continued his erratic and menacing behavior. He moved around his porch while holding a ten inch knife, glaring at the officers, rubbing the edge of the knife, and making obscene gestures to the officers. Clark continued to rub his fingers along the blade of the knife and gesture to the officers to come closer. Thus, the officers knew that Clark was unstable, had recently inflicted bodily harm on his brother, and had a weapon. Additionally, Clark could have left the porch at any time in an open yard that had access to the surrounding neighborhood and nearby homes.

1. **The initial approach by BAPD officers and the use of the pepperball launcher**

Significantly, Clark concedes that once he left the porch and charged the officers with the knife, it was not a violation of the Fourth Amendment for the officers to use lethal force. But Clark instead claims that actions taken by the officers *before* Clark left the porch were "objectively unreasonable under the circumstances in violation of the Fourth Amendment ...." [Amended Complaint, ¶57]. Specifically, Clark claims that the use of the pepperball launcher itself constituted a violation of the Fourth Amendment because the

officers had not (a) summoned a mental health professional to the scene when they supposedly had time to "observe and contain the situation"; and (b) the use of the pepperball launcher "agitated" the mentally ill Clark causing him to leave his "contained position and act irrationally in the direction of law enforcement ... ." Clark claims that the "reckless actions of Colbert" caused or created the need to use force, which violates the Fourth Amendment.  [Id., at ¶ 60].

In evaluating Clark's claims, the Court is mindful of the Supreme Court's recent pronouncement that a violation of the Fourth Amendment cannot be established "based merely on bad tactics that result in a deadly confrontation that could have been avoided.' " *City and County of San Francisco, California v. Sheehan*, 135 S. Ct. 1765, 1777 (2015); quoting *Billingon v. Smith*, 292 F.3d 1177, 1190 (9th Cir. 2002). By the time the pepperball launcher was used, the officers on the scene had been informed that Clark had stabbed his brother, the officers had observed Clark repeatedly ignore every request to drop the knife, Clark was holding the knife in a menacing manner, and was noncompliant even after being told that he was under arrest. It was reasonable for the officers to conclude that if they came within striking distance of Clark, they would be at a risk of serious harm.  The Broken Arrow Police Department Captain directed that the pepper ball launcher be used to prompt Clark to drop the knife.  The use of the pepper ball launcher was reasonable under these circumstances.  See *Mecham v. Frazier,* 500 F.3d 1200 (10th Cir. 2007); *Vinyard v. Wilson*, 311 F.3d 1340, 1348 (11th Cir. 2002); *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1244 – 1245 (11th Cir. 2003).

As noted, the pepperballs had no apparent effect on Clark.  However, Clark thereafter came off the porch and headed towards the officers with the knife.  Once Clark

was within just a few feet of the officers, he was shot and wounded three times. Under the totality of the circumstances, the use of deadly force was reasonable. "The use of deadly force is justified under the Fourth Amendment if a reasonable officer in the Defendant's position would have had probable cause to believe that there was a threat of serious physical harm to themselves or others." *Walker v. City of Orem,* 451 F.3d 1139, 1159 (10th Cir. 2006); *Zia Trust Company v. Montoy*a, 597 F.3d 1150, 1154 (10th Cir. 2010). Courts look at a number of factors in order to evaluate whether or not the actions of the officer were objectively reasonable. In addition to the factors of *Graham v. Connor*, "[w]e may also consider a number of factors, including: '(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect.'"
*Zia Trust Co.,* 597 F.3d at 1154 [quoting *Estate of Larsen v. Murr*, 511 F.3d 1255, 1259 - 1260 (10th Cir. 2008).] See also *Thomson v. Salt Lake City*, 584 F.3d 1304, 1311 (10th Cir. 2009), *Tellez v. City of Belen*, 560 F. App'x 812, 816 (10th Cir. 2014); and *King v. Hill*, 2015 WL 3875551 (10th Cir. June 24, 2015).

All of these factors weigh in favor of the officer's use of lethal force. This determination is supported by *City and County of San Francisco, California v. Sheehan*, 135 S. Ct. 1765 (2015). As in this case, the officers in *Sheehan* were confronted with a mentally disturbed person who came at them with a knife, forcing the officers to shoot. The Supreme Court emphasized that the officer's use of force was reasonable given that Sheehan kept coming at the officers until she was only a few feet away. "At this point, the use of potentially deadly force was justified. Nothing in the Fourth Amendment barred "[the

officers] from protecting themselves, even though it meant firing multiple rounds." 135 S.

Ct. at 1775 (citing *Plumhoff v. Rickard*, 572 U.S. __, 134 S. Ct. 2012, 2022 (2014)).

As noted in *Sheehan*, there are numerous court decisions that have upheld the use of

force upon an armed but mentally ill citizen. See *Bates v. Chesterfield County*, 216 F. 3d 367,

372 (4th Cir. 2000) ("knowledge of a person's disability simply cannot foreclose officers

from protecting themselves, the disabled person, and the general public"); *Sanders v.

Minneapolis*, 474 F.3d 523, 527 (8th Cir. 2007); *Menuel v. Atlanta*, 25 F.3d 990 (11th Cir.

1994) (rejecting excessive force claim arising from use of deadly force to try to apprehend

a mentally ill man who had a knife and was hiding behind a door"). See also *Estate of

Larsen, ex rel. Sturdivant v. Murr,* 511 F.3d 1255 (10th Cir. 2008)(officer's use of lethal force

was objectively reasonable where suspect was armed with large knife, had threatened

violence against himself and others, had refused to drop the knife, and was advancing

towards the officer).

**2.   Clark's claim that the officer's "provoked" and "escalated" the confrontation**

Clark relies heavily on *Allen v. Muskogee*, 119 F.3d 837, 841 (10th Cir. 1997). *Allen*

did opine that any analysis of a use of force may include a consideration of "'whether [the

officers'] own reckless or deliberate conduct during the seizure unreasonably created the

need to use such force.'" 119 F.3d at 840 (10th Cir.1997) (quoting *Sevier v. City of Lawrence,*

60 F.3d 695, 699 (10th Cir.1995)). But the Tenth Circuit has repeatedly cautioned that this

consideration is simply an examination of the "totality of the circumstances." Additionally,

the Tenth Circuit has emphasized that in *Allen* the denial of summary judgment to the

officers was based upon a specific dispute of fact over eyewitness testimony. In *Allen* the

plaintiff asserted that the officers ran up to a suicidal man sitting alone in his car,

"screaming" commands, rushed the car and tried to wrestle away the gun from his hand. Because of this factual dispute, and because the defendants had not raised the defense of qualified immunity (which imposes a higher standard of review), the officer's motion for summary judgment was denied. See discussion of the limitations of *Allen* at *Medina*, p. 1133.

In *Medina v. Cram,* 252 F.3d 1124, 1132-33 (10th Cir. 2001), the Tenth Circuit cautioned that "the conduct arguably creating the need for force must be immediately connected with the seizure and must rise to the level of recklessness, rather than negligence. The primary focus of our inquiry, therefore, remains on whether the officer was in danger at the exact moment of the threat of force." [Emphasis added]. This Circuit has upheld the actions of the officers in approaching and attempting to seize a mentally ill, even suicidal, suspect. In *Medina*, the Tenth Circuit held that the officers did not unreasonably provoke or escalate the situation by failing to take cover and instead acting to prevent a suspect they believed to be armed from escaping. The Tenth Circuit also rejected the plaintiff's claim that the officers made various tactical errors because any such errors did not "rise to the level of reckless or deliberate conduct." *Medina*, at 1132. In *Jiron v. City of Lakewood*, 392 F.3d 410 (10th Cir. 2004), the officer was accused of "recklessly and intentionally creat[ing] a situation in which deadly force was necessary by cornering Plaintiff in the back bedroom, repeatedly ordering Plaintiff out of the bedroom, and attempting to open the bedroom door even though Plaintiff had no means of escape." Id., at p. 418. The Tenth Circuit held that the officer's decision to enter the bedroom "was far from reckless" especially considering that the plaintiff had grabbed a knife, retreated into a bedroom, threatened to kill herself, and had tried to escape out a bedroom window.

Here, Clark was not passively sitting alone in his room, contemplating possible suicide. He had already committed a violent felony, was glaring at the officers while brandishing the 10-inch knife, making a variety of hostile and erratic gestures, and was standing on a porch with the ability to leave the porch and head for the surrounding neighborhood at any time. The officers had a legitimate concern that Clark might leave the porch armed with the knife and head toward them or others in the neighborhood. Clark could have also re-entered his house and armed himself with more weapons. It was reasonable for the officers to approach and use the pepperball launcher to try to disarm Clark. The fact that Clark was mentally ill does not change the threat. *Hassan v. City of Minneapolis*, 489 F.3d 914, 920 (8th Cir. 2007) ("Hassan argues the officers should have known Jeilani's behavior indicated he was mentally ill, and thus, their conduct was unreasonable. However, even if Jeilani were mentally ill, Jeilani's mental state does not change the fact he posed a deadly threat to the officers and the public."). Under these circumstances, even in consideration of Clark's mental health status, the decision of the officers to approach and take steps to disarm and apprehend Clark did not violate Clark's constitutional rights under the Fourth Amendment.

Clark relies heavily on the conclusions of his expert witness Darrell Coslin. Mr. Coslin opines that the officers did not adequately consider Clark's mental health issues, that the officers should have behaved differently in dealing with Clark, that the officers "failed to consider" other options in dealing with Clark, that there was no true "exigency," and that the officers acted hastily and should have spent more time dealing with Clark. The Supreme Court has firmly rejected this type of "evidence." It is well established that, "so long as a reasonable officer could have believed his conduct was justified, a plaintiff cannot

avoid summary judgment by simply producing an expert's report that an officer's behavior leading up to the deadly confrontation was imprudent, inappropriate or even reckless." *City and County of San Francisco, Calif. v. Sheehan*, 135 S.Ct. 1765, 1777 (2015) (quotation omitted).

3. **There is no basis to establish liability of Defendant Colbert**

Clark's excessive force claim under the Fourth Amendment fails under the first prong of the analysis. There is no predicate existence of any excessive force. That point alone justifies summary dismissal of Clark's excessive force claim. To impose supervisory liability, a plaintiff first must "establish the supervisor's subordinates violated the [C]onstitution." *Dodds v. Richardson*, 614 F.3d 1185, 1195 (10th Cir.2010) (internal quotation marks omitted).

Additionally, Clark has failed to present any basis for liability against Defendant Colbert. To establish supervisory liability against Defendant Colbert, Clark must establish three elements: (1) personal involvement; (2) causation, and (3) state of mind. *Dodds v. Richardson*, 614 F.3d 1185, 1199–200 (10th Cir. 2010); *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767–69 (10th Cir. 2013).

4. **Personal Involvement**

Clark has failed to establish any "personal involvement" by Defendant Colbert that caused any excessive use of force. Plaintiff relies on *Allen v. Muskogee*, 119 F.3d 837 (10th Cir. 1997), for the proposition that the reasonableness of the Defendant's actions depends on "whether the officers were in danger at the precise moment that they used force and on whether Defendants' own reckless or deliberate conduct during the seizure unreasonably created the need to use such force." *Allen*, at 840. Defendant Colbert arrived on the scene

14

after seven other Broken Arrow Police Department officers were on the scene, including Captain DuFriend.  When Sheriff Colbert arrived, he advised Captain Dufriend of the Broken Arrow Police Department, that Captain Dufriend had control of the scene and deferred to the Broken Arrow Captain to "do what you have to do." Captain Dufriend formulated a plan of action and assigned tasks to the officers on scene. Although Clark claims that Broken Arrow's use of the pepper ball launcher somehow "recklessly" escalated the confrontation, Sheriff Colbert had no involvement in directing any officer to use the pepper ball launcher. Clark has failed to establish that Colbert was responsible for what Clark labels as "reckless" provocation.

   5. **Causation**

   "A plaintiff [must] establish the 'requisite causal connection' by showing 'the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights.'" *Dodds v. Richardson*, 614 F.3d at 1185 (quoting *Poolaw v. Marcantel,* 565 F.3d 721, 732–33 (10th Cir. 2009)).   Clark must show more than a supervisor's "mere knowledge of his subordinate's conduct."  *Schneider*, 717 F.3d at 767 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 677, 129 S.Ct. 1937 (2009)).   In the instant case, the events that Clark points to as an escalation or provocation of the incident which Clark claims led to the use of force, the approach of the BAPD officers and the use of the pepperball launcher by BAPD, were not directed by Sheriff Colbert, but at the direction of Captain DuFriend, an officer of a separate law enforcement agency, the Broken Arrow Police Department.   Although Clark accuses Colbert of having knowledge of BAPD plan, this fails to show that Colbert was the moving force behind the actions taken by the officers at the scene.

6. **State of mind**

In order to establish the third element, state of mind, necessary to extend liability to Defendant Colbert, Clark must establish a culpable state of mind equal to that required to establish the underlying constitutional violation. *Dodds v. Richardson*, 614 F.3d 1185, 1195 (10th Cir. 2010). Specifically, "[l]iability of a supervisor under § 1983 must be predicated on the supervisor's deliberate indifference." *Green v. Branson*, 108 F.3d 1296, 1302 (10th Cir. 1997); see also *Serna v. Colo. Dept. of Corr.*, 455 F.3d 1146 (10th Cir. 2006). It is well-established that in the "context of supervisor liability under § 1983, 'mere negligence' is not enough." *Serna,* 544 F.3d at 1154. Clark has failed to show that Colbert had a culpable state of mind or that he knew "he was creating a situation that created a substantial risk of harm." See Id. at 1155. The record shows that Colbert believed BAPD was more equipped to handle the standoff with Clark and that the goal of BAPD's plan was to arrest of Plaintiff without harming him or others. Clark has offered no evidence to contradict that purpose, such as a pattern or practice of prior constitutional abuses by Colbert or his subordinates. Clark must establish the liability of each supervisory official and, while "[i]t may be tempting to name every individual in the chain of command, . . . that alone is insufficient to survive summary judgment." *Id.*

Thus, in addition to failing to show an underlying constitutional violation, Clark has failed to establish any basis for holding Defendant Colbert liable for any of Clark's claimed injuries.

**B. Plaintiff's Deprivation of Liberty Claim**

As previously discussed, after the shooting, Sheriff Colbert spoke with the media about the incident and stated that officers had "tried everything they could do that's less

lethal." Colbert also stated that "two or three different negotiators [tried] to talk to him, but it just wasn't happening," and that Clark "broke and charged at the officers." Colbert also stated to the media that the officers deployed non-lethal pepper balls, tasers, and firearms at Clark when he was within feet of the officers. The Assistant District Attorney handling the prosecution of Clark stated that statements made by Colbert to the media played no role in the decision made by the District Attorney's Office to file criminal charges against Gary Clark.

Clark asserts that "false and misleading statements" allegedly made by Sheriff Colbert to the media led to Clark being arrested and criminally prosecuted for assault and battery with a deadly weapon. In the briefing before the Court, Clark characterizes his "Deprivation of Liberty" claim as a "stigma plus" claim asserted under the Fourteenth Amendment.

A "governmental defamation, coupled with an alteration in legal status, violates a liberty interest that triggers procedural due process protection." *Brown v. Montoya*, 662 F.3d 1152, 1167 (10th Cir. 2011). Clark's assertion that Sheriff Colbert violated the Due Process Clause, requires Clark to demonstrate: (1) the government made a statement about him or her that is sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she asserts is false, and (2) the plaintiff experienced some governmentally imposed burden that "significantly altered [his or] her status as a matter of state law." *Paul v. Davis*, 424 U.S. 693, 701, 7190-11; 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). This is sometimes described as the "stigma plus" standard.

Under this standard, Clark must first establish that the statements of Colbert to the press were false. See *Gwinn v. Awmiller*, 354 F.3d 1211, 1216 (10th Cir. 2004), holding that the elements for this claim include proof that the "government made a statement about

17

him or her that is sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she asserts as false".  Because Colbert made no reference to Clark's mental health status in his comments to the press, Clark complains that this was a suggestion to the press that Clark charged the officers "with his mental faculties fully intact."  As previously discussed, Clark was standing on the porch with a knife, was holding off the police in a standoff, and was making obscene gestures at the police. Colbert's comments are understandable given that Clark had refused to drop the knife or come off of the porch, even when faced with a number of police officers, who tried to talk to Clark and persuade him to drop the knife.  The record before the Court establishes that Clark was in a standoff with the police for 47 minutes and that after the officers tried repeatedly to persuade Clark to drop the knife, and finally resorted to the pepperball launcher, that Clark broke and charged the officers.  Under this set of facts, Colbert's comments were not defamatory.

Clark claims that Colbert's statement to the press "found its way into the probable cause affidavit supporting Mr. Clark's arrest." Clark has failed to establish any factual support for any accusation that Colbert's statements to the press were transferred into the probable cause affidavit.  The summary judgment record shows that the probable cause affidavit filed in connection with the criminal charges against Clark was prepared by Wagoner County Major Dustin Dorr.  Clark does not claim that any of the statements made in the affidavit are actually false, just that the affidavit should have included a characterization of Mr. Clark as mentally ill.  This is insufficient to show that Colbert personally defamed Clark in the affidavit. Clark has failed to establish that Colbert had a role in the preparation of the affidavit.

Clark's claim that the prosecution may have relied upon a false characterization by Colbert is unsupported by the record. The prosecuting attorney was not aware of the contents of Colbert's statements to the press. Clark has failed to show any causal link between Colbert's statements to the media and the district attorney's later decision to prosecute Clark for assault and battery. See *Kennedy v. Smith,* 259 Fed. Appx. 150 (10th Cir. 2007); *Hall v. Kan. Comm'n on Veteran's Affairs,* 2012 WL 1194331 (D. Kan. April 9, 2012).

There is no evidence to support the claim that any statements made by Colbert regarding the events of August 18, 2014, led to a false arrest or malicious prosecution of Gary Clark. The summary judgment record includes the sworn statement from the Assistant District Attorney involved in the criminal prosecution of Gary Clark. The Assistant District Attorney affirmed that he was not aware of any comments Sheriff Colbert may have made about this incident to the press; and affirmed that any comments to the press had no effect on any criminal prosecution of Clark. Additionally, the summary judgment record notes the judicial determination of probable cause for the charges filed against Clark. The preliminary hearing was held in the criminal action on January 27, 2015. Gary Clark was represented by counsel during the hearing. The Wagoner County District Court found that probable cause existed to support the charges against Gary Clark.

Additionally, Clark misapprehends the "stigma plus" test. The "stigma plus" test is not satisfied merely by claiming that Sheriff Colbert failed to include comments to the press about Clark's mental health status, and that a criminal prosecution followed. The Due Process clause of the Fourteenth Amendment provides protection for liberty and property interests. However, not every interest is protected by the Due Process Clause. The "stigma plus" test was developed to identify whether or not a protectable interest existed which

might be subject to protection under the Due Process Clause of the Fourteenth Amendment. That is, under the stigma plus test, reputation alone is not an interest protected by the Due Process Clause.

To show he was entitled to due process, Clark must show both a defamation (stigma) plus the deprivation of some additional right or interest. *Paul v. Davis*, 424 U.S. 693, 710-11 (1976); *Guttman v. Khalsa*, 669 F.3d 1101, 1125 (10th Cir. 2012); *Gwinn v. Awmiller*, 354 F.3d 1211, 1216 (10th Cir. 2004); *Nixon v. City and County of Denver*, 784 F.3d 1364, 1368 (10th Cir. 2015). Clark's complaint that Colbert erred when he did not emphasize Clark's mental health status in his statements to the press is at best an accusation of negligence on the part of Sheriff Colbert. However, a plaintiff must show that the Defendant was more than simply negligent to establish a procedural due process claim. See *Brown v. Montoya*, 662 F.3d 1152, 1170 (10th Cir. 2011).

But even if it is assumed that Clark has established a protectable liberty interest, the Court must determine if procedural due process was afforded to Clark. Even if the Court assumes that a protectable liberty interest has been implicated, at that point the Court must determine the appropriate level of process that should be afforded for the protection of that liberty interest. The Tenth Circuit has identified the elements of a procedural due process claim: to determine whether an individual was denied procedural due process, "Courts must engage in a two step inquiry: (1) did the individual possess a protected interest such that the due process protections were applicable; and if so, (2) was the individual afforded an appropriate level of process." 662 F.3d at 1167, quoting from *Merrifield v. Board of Cnty Comm'rs*, 654 F.3d 1073, 1078 (10th Cir. 2011). In *Brown v. Montoya*, 662 F.3d 1152, 1167 (10th Cir. 2011), relying upon the "stigma plus" test after

finding the plaintiff had pled sufficient facts to show a protected liberty interest, the Court turned to the next step in the analysis. The Tenth Circuit determined that before an inmate can be classified as a sex offender, the inmate is entitled to "notice of the charges, an opportunity to present witnesses and evidence in defense of those charges, and a written statement by the fact finder of the evidence relied on and the reasons for the disciplinary action." [Id.] at 1168, quoting from *Gwinn*, 354 F.3d at 1219. Because the inmate was given no due process before he was placed into the sex offender probation unit and directed to register as a sex offender, the inmate's case was allowed to proceed.

Clark makes no effort to demonstrate that he was denied procedural due process when he was later charged with a felony for stabbing his brother and charging the officers with an upraised knife. The Court has reviewed the records related to the criminal prosecution of Clark in the Wagoner County District Court. The record reflects that a probable cause affidavit was prepared, the criminal information was filed, and that Clark was given notice of all charges. It further indicates that counsel was appointed for Clark, he was advised of the witnesses and evidence against him, and he had the opportunity to confront and challenge the prosecution's witnesses and evidence at the preliminary hearing. As such, Clark was afforded ample due process through the subsequent criminal process. See *Graham v. City of Philadelphia*, 402 F.3d 139 (3rd Cir. 2005).

### C. Colbert's claim of qualified immunity

When a defendant asserts qualified immunity, the burden shifts to the plaintiff to demonstrate: (i) that the defendant's actions violated his constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct. See *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009); *Martinez v. Beggs*, 563 F.3d

21

1082, 1088 (10th Cir.2009). The qualified immunity doctrine gives "'government officials breathing room to make reasonable but mistaken judgments,' and 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Carroll v. Carman*, 135 S. Ct. 348, 350 (2014) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). "The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson v. Callahan*, 555 U.S. at 223, 231 (internal quotation marks omitted). Thus, even if an officer's conduct has violated the Fourth Amendment, he is entitled to qualified immunity unless the officer violated a "clearly established" constitutional right. *Plumhoff v. Rickard,* 134 S. Ct. 2012, 2022-23 (2014). The plaintiff bears the burden to show that the contours of the right were clearly established at the time of the alleged misconduct. *Kerns v. Bader*, 663 F.3d 1173, 1180 (10th Cir. 2011) The Plaintiff must establish that the law was clearly established "beyond debate." *al-Kidd*, at 741; *Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014).

The Supreme Court "ha[s] repeatedly told courts not to define clearly established law at a high level of generality." *Mullenix*, 136 S.Ct. at 308. (quotations and punctuation omitted). According to the Supreme Court, "[t]he dispositive question is whether the violative nature of *particular* conduct is clearly established." Id. (quotations omitted) (emphasis in original). Furthermore, "[t]his inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." Id. (quotations omitted). Additionally, "[s]uch specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the

officer confronts." Id. (quotations and punctuation omitted). The Supreme Court recently held that judges should reject the invitation to pick among tactical alternatives in determining the reasonableness of a use of force. *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (rejecting suggestion that officer should have waited to see if tire-deflation device worked before shooting at engine block of fleeing vehicle).

As previously discussed, there is no underlying constitutional violation that will support the denial of qualified immunity. Additionally, Clark has presented no evidence that Sheriff Colbert was the one that personally participated in and/or directed actions that Clark claims violated his constitutional rights.

Clark complains that the officers should have approached him differently, not used the pepper ball launcher, and instead summoned a mental health professional to the scene in order to accommodate Clark's mental illness. [Amended Complaint, ¶ 57]. But Clark has failed to establish clearly established law that would brand the officers' failure to follow Clark's suggested alternative tactics as a violation of the Constitution.

Clark's "bad tactics" argument follows the same path as the argument presented in *Sheehan*. There, the Ninth Circuit had ruled that it was clearly established that an officer cannot "forcibly enter the home of an armed, mentally ill subject who had been acting irrationally and had threatened anyone who entered when there was no objective need for immediate entry." *Sheehan vs. San Francisco*, 743 F.3d 1211, 1229 (9th Cir. 2014). However, on certiorari review, the Supreme Court rejected the idea that there was any "robust consensus of cases" on this point: "Rather, we simply decide whether the officers' failure to accommodate Sheehan's illness violated clearly established law. **It did not**." *Sheehan*, at 1775 (emphasis added). See also *Sheehan* at p. 1778: "[N]o such consensus

23

exists here.  If anything, the opposite may be true.  See, e.g., *Bates v. Chesterfield County*, 216 F.3d 367, 372 (C.A.4 2000) ("Knowledge of a person's disability simply cannot foreclose officers from protecting themselves, the disabled person, and the general public"); *Sanders v. Minneapolis*, 474 F.3d 523, 527 (C.A.8 2007) (following *Bates,* supra ); *Menuel v. Atlanta*, 25 F.3d 990 (C.A.11 1994) (upholding use of deadly force to try to apprehend a mentally ill man who had a knife and was hiding behind a door)."

The authorities cited by Clark are neither controlling nor persuasive.  *Allen* must be read in conjunction with *Sheehan.* As in *Allen*, Sheehan argued that the officers provoked the confrontation by entering her room. The Ninth Circuit accepted this argument and denied the claim of qualified immunity holding that it was clearly established that an officer cannot "forcibly enter the home of an armed, mentally ill subject who had been acting irrationally and had threatened anyone who entered when there was no objective need for immediate entry." *Sheehan v. City and County of San Francisco*, 743 F.3d 1211, 1229 (9th Cir. 2014).  But the Supreme Court rejected the argument that a constitutional violation can be based on an officer's behavior leading up to the use of force. See *Sheehan*, 135 S.Ct. 1765, 1777 [holding that, even if the officers misjudged the situation, Sheehan cannot "'establish a Fourth Amendment violation based merely on bad tactics that result in a deadly confrontation that could have been avoided.'" quoting *Billington v. Smith*, 292 F.3d 1177, 1190 (9th Cir. 2002)].

This proposition from *Billington*, which was endorsed by the Supreme Court in *Sheehan*, is firmly established.  *Lal v. California*, 746 F.3d 1112, 1118 (9th Cir. 2014) ("Thus, even assuming that it might have been possible for the officers to have given [the suicidal suspect] a wider berth, under our opinion in *Billington*, there is no requirement that such

24

an alternative be explored."); *George v. Morris*, 736 F.3d 829, 839 n.14 (rejecting expert's pre-shooting, police-tactics criticisms, including the failure to gather intelligence before entering the back yard, bringing assault rifles, and failing to set up a non-confrontational perimeter); *Reynolds v. County of San Diego*, 84 F.3d 1162, 1170 (9th Cir. 1996) (rejecting expert's testimony that the shooting deputy "should have called for back-up, talked to [the emotionally disturbed person] in calm tones, and refrained from approaching [the EDP] while he had the knife").

Courts have recognized that claims that the plaintiff's constitutional rights were violated by officers "provoking" or escalating a confrontation have been "plainly torpedoed" by *Sheehan*. See *Rachel v. City of Mobile Alabama*, 112 Fed. Sup. 3d. 1263, 1282 (S.D. Alabama 2015); *Rucinski v. Cty. of Oakland*, 655 F. App'x 338, 343 (6th Cir. 2016)(recognizing that *Sheehan* rejected claim based on "bad tactics" that escalated a situation that could have been avoided.); *Ellenburg v. Henderson Cty. Jail*, No. 1:14-CV-290-FDW, 2016 WL 1354980, at *7 (W.D.N.C. Apr. 5, 2016)(rejecting claim that officer "created a dangerous situation" in light of holding of *Sheehan*); *Bell v. Cumberland Cty.*, No. 16-5403, 2016 WL 7048696, at *5 (6th Cir. Dec. 5, 2016)(In light of *Sheehan*, rejecting contention that the officer violated the suspect's constitutional rights by instigating the encounter by pursuing the suspect.).

Additional case law cited by Clark is not controlling, and has been overruled by subsequent opinions of the Supreme Court. Clark relies on *Aldaba v. Pickens*, 777 F.3d 1155 (10th Cir. 2015). *Aldaba* cannot establish a "clearly established right" as it has been vacated by the Supreme Court and <u>replaced with a new opinion</u>. [The original *Aldaba* Tenth Circuit opinion was vacated at 136 S. Ct. 479 (2015), based upon *Mullenix*.] In the revised

25

opinion the Tenth Circuit ruled that, given the Supreme Court's directives in *Mullenix v. Luna*, 577 U.S. ––––, 136 S.Ct. 305 (2015) (per curiam), the Tenth Circuit had erred in relying on a "sliding scale" and failing to identify cases that demonstrated that the *particular conduct* at issue had been clearly determined to be improper under the Constitution.  See *Aldaba v. Pickens*, 844 F.3d 870 (2016).  Importantly, after reviewing a number of cases concerning the use of force against persons with mental illness,  the Tenth Circuit ruled that none of these cases would inform the officers "beyond debate" that their actions constituted excessive force.    Therefore, qualified immunity was granted to the officers.

Clark relies heavily on *Pauly v. White*, 814 F.3d 1060 (10th Cir. 2016).  But *Pauly* has also been vacated and remanded by the Supreme Court.  See *White v. Pauly*, 2017 WL 69170 (Jan. 9, 2017):  holding that the Tenth Circuit erred when it "failed to identify a case where an officer acting under similar circumstances as [the defendant officer] was held to have violated the Fourth Amendment."  Id., at * 5.

The remaining cases cited by Clark have no factual parallel to the facts of this case. In *Estate of Armstrong v. Village of Pinehurst*, 810 F.3d 892 (4th Cir. 2016), the deceased, an unarmed mental health patient, had wrapped himself around a sign post, and refused to budge.  Within seconds after learning that an order of commitment had been issued, the officers tased the mental health patient multiple times.  The officers pried the patient off the post, and in the struggle the patient was choked and died.  However, under these facts the Fourth Circuit determined that the patient's right "not to be tased while offering stationary and non-violent resistance to a lawful seizure" was not clearly established.  Id., at 907-908.  The officers were granted qualified immunity.

26

Clark's other cited cases have no factual parallel to this case. *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 901 (6th Cir. 2004) (qualified immunity denied to officers who lay atop an autistic man—whom they knew to be "mentally ill or retarded"— and continued to pepper spray him in the face after he had stopped resisting arrest and was not a flight risk); *Deorle v. Rutherford*, 272 F.3d 1272 (9th Cir. 2001) (qualified immunity denied to officer who, without warning, fired a lead-filled bag into the face of a man with mental health issues resulting in damage to one eye and leaving lead in his skull, when the man had complied with officers' orders); *Abdullahi v. City of Madison*, 423 F.3d 763 (7th Cir. 2005) (genuine issue of material fact existed about excessive force in the death of a unarmed, combative, disoriented man because of conflicting evidence about whether the officer had applied undue pressure to the man's back in an effort by a group of officers to handcuff him.) Likewise, in *Allen v. Muskogee*, 119 F.3d 837, 841 (10th Cir. 1997) the critical facts that precluded summary judgment were that the officers reportedly ran up to a suicidal man sitting alone in his car, rushed the car "screaming" commands, and tried to wrestle the gun out of his hands.  Importantly, *Allen* did not address qualified immunity.

Upon review of the cases cited on this issue, the Court concludes that it is not clearly established that any of the actions of the officers, including Defendant Colbert, violated the Constitutional rights of Clark.  Because Clark has failed to carry his burden of establishing a violation of his constitutional rights, and because the law is not clearly established that the actions of Defendant Colbert violated the law, Defendant Colbert is granted qualified immunity on all claims asserted by Clark under 42 U.S. § 1983.

### D.    Plaintiff's state law negligence claim

In the Amended Complaint, Clark asserts a state law negligence claim, alleging that "the use of force supervised by, orchestrated, and set in motion by Colbert and Dorr was objectively unreasonable ...."   [Amended Complaint, ¶ 82]   To the extent that this negligence claim is asserted against Colbert in his individual capacity, it is barred by law. See 51 O.S. § 152.1(A):   All governmental employees acting within the scope of their employment "shall be immune from liability for torts."   51 O.S. § 163(C):" In no instance shall an employee of the state or political subdivision acting within the scope of his employment be named as defendant."   Clark has asserted that Colbert was acting within the scope of his employment.   [See ¶ 83 of the Amended Complaint]   Clark has failed to establish any facts that would show that Colbert was acting outside the scope of his employment during the events leading up to Clark's injuries.

Any negligence claim against the office of the Sheriff is likewise barred. Specifically, to the extent that this claim is based upon accusations that Sheriff Colbert was negligent in a plan "supervised by, orchestrated and/or set in motion" by Sheriff Colbert, this claim is barred by the Governmental Tort Claims Act. See 51 O.S. § 155(5), which preserves immunity for claims arising out of the discretionary acts such as the supervision of employees.  See *Carlson v. City of Broken Arrow,* 884 P.2d, 1209, 1212 (OK CIV APP 1994), *Ochoa v. Taylor*, 635 P.2d 604, 608 (Okla. 1981); *Randell v. Tulsa Ind. School Dist. No. 1,* 889 P.2d 1264, 1267 (OK CIV APP 1994).  In *Elizabeth S. v. Oklahoma City Public Schools*, No. CIV-08-105-M, 2008 WL 4147572 (W.D.Okla. Sept. 3, 2008)(unpub) the plaintiff asserted negligence against a school district and school officials, alleging that defendants failed in their duty to supervise a teacher who assaulted a student and that defendants were

28

negligent in retaining the teacher. The court determined that these negligence claims (i.e., negligent hiring and retention) were based upon the school district and its employees' performance of, or failure to perform discretionary acts and that § 155(5) applied to immunize the school district from the plaintiff's claims regarding negligence in supervising and retaining its employee. *Id.* at \*5. *See also Burns v. Holcombe*, No. 09–CV–152–JHP, 2010 WL 2756954, at \*13 (E.D. Okla. July 12, 2010) ("The language of the GTCA as well as recent case law construing these provisions makes clear the state and/or a political subdivision is not subject to suit for discretionary acts such as hiring, supervising, and training employees...") (unpub); *Fumi v. Bd. of Cty. Comm'rs of Rogers Cty.*, No. 10-CV-769-TCK, 2011 WL 4608296, at \*6-7 (N.D. Okla. Oct. 3, 2011) (unpub); *White v. City of Tulsa, Okla.*, No. 13-CV-128-TCK-PJC, 2013 WL 4784243, at \*5 (N.D. Okla. Sept. 5, 2013) (unpub).

To the extent that Plaintiff's negligence claim is premised upon City of Broken Arrow Sergeant Blevins' use of the pepperball launcher against him,  Defendant Colbert is further immune from suit pursuant to Okla. Stat. tit. 51, § 155(18) which provides tort immunity for an "act or omission...of a person other than an employee of the state or political subdivision at the time the act or omission occurred."

Moreover,  use of the pepperball gun on Clark was objectively reasonable under the factual circumstances.  *See Dawson v. Anderson County, Tex.*, 566 Fed.Appx. 369, 370-71 (5th Cir., May 6, 2014) (unpub); *see also Morales v. City of Okla. City*, 230 P.3d 869, 878-881 (Okla. 2010) (wherein the Oklahoma Supreme Court adopted the same "objective reasonableness" standard of care for state law negligence claims premised upon the use of force during an arrest as that used in federal § 1983 excessive force claims).

Accordingly, for the reasons set forth above, Defendant Colbert is entitled to summary judgment with regard to Plaintiff's state law negligence claims and on all claims asserted by the Plaintiff.

**IT IS SO ORDERED this 18th day of July, 2017.**

James H. Payne
United States District Judge
Eastern District of Oklahoma