## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1)  GARY CLARK,                                     ) | |
| )                                                    | |
| Plaintiff,          ) | |
| v.                                                   )          Case No. 16-CV-115-JHP |
| )                                                    | |
| (2)  ROBERT COLBERT, in his official                 ) | |
| and individual capacity as Sheriff of                ) | |
| Wagoner County, Okla., *et al.*,                     ) | |
| )                                                    | |
| Defendants.         ) | |

### OPINION AND ORDER

Now before the Court is the Defendants Dustin Dorr and Vicki Holland's Motion for

Summary Judgment [Dkt. 94].  After consideration of the pleadings, affidavits, and briefs, the

Court grants Defendants' motion.

### I. STANDARD OF REVIEW

Rule 56(a) of the Federal Rules of Civil Procedure provides that "[t]he court shall grant

summary judgment if the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law." Summary judgment is not a

disfavored procedural shortcut, but an integral part of the federal rules as a whole. *Celotex Corp.*

*v. Catrett*, 477 U.S. 317 (1986).

In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986), the Supreme Court held

that "there is no issue for trial unless there is sufficient evidence favoring the non-moving party

for a jury to return a verdict for that party." The Court further held that "if the evidence is merely

colorable, or not significantly probative, summary judgment may be granted." *Id.* In addition, the

*Anderson* Court stated that "the mere existence of a scintilla of evidence in support of a

plaintiff's position will be insufficient; there must be evidence on which a jury could reasonably

find for the plaintiff." *Id.* A movant's summary judgment burden may properly be met by

reference to the lack of evidence in support of plaintiff's position. *See Adler v. Wal-Mart Stores,*

*Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex*, 477 U.S. at 325).

Furthermore, as described by the court in *Cone v. Longmont United Hosp. Ass'n.*, 14 F.3d 526 (10th Cir. 1994), "Even though all doubts must be resolved in (the nonmovant's) favor, allegations alone will not defeat summary judgment." *Cone* at 530 (citing *Celotex*, 477 U.S. at 324). *See also Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991); *Roemer v. Pub. Serv. Co. of Colo.*, 911 F. Supp. 464, 469 (D. Colo. 1996). Moreover, "(i)n response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).

## II. UNDISPUTED FACTS

Reviewing the evidentiary material submitted by the parties, the Court finds that there are no material disputes as to the following facts:

On August 19, 2014, the Wagoner County District Attorney filed a criminal Information in Wagoner County District Court Case No. CF-14-421 alleging Plaintiff had assaulted and battered Larry Clark and had assaulted Defendant Dorr on August 18, 2014. The Information charged Plaintiff with one count of assault and battery with a dangerous weapon and one count of assault with a deadly weapon. On August 22, 2014, the District Attorney filed a Second Page Information setting forth information regarding Plaintiff's prior convictions.

On August 18, 2014, an Affidavit for Search Warrant was executed and ultimately filed of record in the Wagoner County District Court Case No. CF-14-421 on August 25, 2014. The Affidavit states the Broken Arrow Police received a call for assistance from the Wagoner County Sheriff's Office on August 18, 2014 in reference to assault at 9501 South Hillcrest Drive in Wagoner County. The Affidavit states the victim advised officers that Plaintiff had attacked him

2

using a kitchen knife, the victim advised officers that Plaintiff had been off of prescribed medications for a mental condition, and that this was not the first incident in which Plaintiff had been involved with law enforcement due to mental issues.

On August 19, 2014, Defendant Dorr executed a Probable Cause Affidavit for Arrest Without Warrant regarding the underlying incident and outlining possible criminal charges for the Plaintiff's assault of his brother, Larry Clark. The Affidavit was filed of record in Wagoner County District Court Case No. CF-14-421 on September 3, 2014. On August 19, 2014, Defendant Dorr also executed a Probable Cause Affidavit for Arrest Without Warrant regarding the underlying incident and outlining possible criminal charges for the Plaintiff's assault of peace officers. This Affidavit was not filed of record in Wagoner County District Court Case No. CF-14-421.

On August 25, 2014, Defendant Dorr executed a Probable Cause Affidavit for Arrest Without Warrant regarding the underlying incident and outlining possible criminal charges for the Plaintiff's assault of Larry Clark and peace officers. The Affidavit was filed of record in Wagoner County District Court Case No. CF-14-421 on September 3, 2014. (Ex. 6, Third Probable Cause Affidavit for Arrest Without Warrant).

On January 27, 2015, a preliminary hearing was held in Wagoner County District Court Case No. CF-14-421 at which Plaintiff was represented by counsel. At the hearing, the court heard extensive testimony regarding the reasons that Larry Clark called the Sheriff's Office about Plaintiff on August 18, 2014, and about Plaintiff's mental health status on that date. The Wagoner County District Court overruled Plaintiff's demurrer, found probable cause existed to believe that Plaintiff committed the crimes alleged in the Information and bound Plaintiff over for trial. A Preliminary Hearing Bind Over Order was filed of record that same day, January 27,

2015.

On June 5, 2015, the District Attorney filed an Amended Information and an Amended Second Page Information in the underlying criminal action. The filing did not alter or amend the charges against Plaintiff, but rather amended the information regarding Plaintiff's prior convictions.

Defendant Holland was employed by the Wagoner County Sheriff's Office, part-time, to provide medical care and treatment to the inmates in the Wagoner County Jail. She was employed in this capacity from September 14, 2013 until August 1, 2015. During this same time period, she was employed by the Jack C. Montgomery VA Medical Center in a full-time capacity and is still employed full-time by the Jack C. Montgomery VA Medical Center. Defendant Holland is an Advanced Practice Registered Nurse-Certified Nurse Practitioner (APRN-CNP). She has held her APRN-CNP certification since October 7, 1996. Her Prescriptive Authority recognition was first issued on February 4, 1997. She was first licensed as a Registered Nurse on September 5, 1978. As an APRN-CNP in Oklahoma, Defendant Holland is allowed to independently diagnose and treat patients without physician involvement and is also allowed to independently prescribe medications. She is a primary care provider.

Plaintiff was discharged from the St. John Medical Center on August 29, 2014, by Brandon King, APRN-CNP. Plaintiff's Clinical Discharge Instructions advised he should have a follow-up with Jules Dumais of Tulsa Bone and Joint within 7-10 days, follow-up with St. John Trauma Service as needed - only if needed, follow-up with Barry Eisen of St. John Clinic - Gastroenterology as needed, and a follow-up with his primary care provider within 3-4 days. Plaintiff was first booked into jail following his injury on August 29, 2014. According to his records, the Plaintiff was injured by gunshots on August 19, 2014. During his initial inmate

4

intake and medical screening, Plaintiff indicated that he did not have any pain, injury or medical condition that required the care of a doctor.

Defendant Holland was not scheduled to work in the Wagoner County Jail on August 29, 2014. However, shortly after the Plaintiff was booked into the Wagoner County Jail, she received his Clinical Discharge Instructions from St. John Medical Center. After her review of the discharge instructions, she called the discharging nurse practitioner, Brandon King, APRN-CNP, to discuss the Plaintiff's medical care and treatment needs. During her conversation with Brandon King, APRN-CNP, she took notes on the discharge paperwork. She also verified the Plaintiff's current prescriptions. Brandon King, APRN-CNP, confirmed that there was no need for follow up care with any other doctor or specialist at the time since the Plaintiff would be in Defendant Holland's care during his incarceration. From the time of Plaintiff's incarceration in the Wagoner County Jail from August 29, 2014 until her last day working in the jail on August 1, 2015, Defendant Holland examined the Plaintiff on ten occasions.

On August 30, 2014, Defendant Holland made a special trip to the Wagoner County Jail for the sole purpose of providing medical care and treatment to the Plaintiff after learning about his release from the hospital and transfer to the jail one day earlier. During her examination of the Plaintiff on August 30, 2014, among other things, Defendant Holland noted Plaintiff's injuries and that he had no active bleeding. She also noted that Plaintiff had healing surgical wounds at his right femur and on his abdomen; the gunshot wounds on Plaintiff's left flank and left upper back were seeping, but there were no signs or symptoms of infection. Her instructions to the medical staff and jailers were to provide a bath daily to the Plaintiff, wash the gunshot wounds with soap and water and place dry dressings over the two wounds which were still draining, walk the Plaintiff every three hours, Plaintiff was to use the bathroom as needed and

was to sit up for all meals.  She prescribed Plaintiff 325mg of Aspirin daily to suppress blood clot presentations and ordered him to continue all other medications prescribed from the hospital.

On September 4, 2014, Defendant Holland again evaluated Plaintiff's gunshot wounds. The gunshot wounds on Plaintiff's back and abdomen were all healing well with minimal clear drainage; however, the incision on Plaintiff's right femur was red and warm to the touch and had began draining with a foul odor.  She prescribed Plaintiff Clindamycin three times per day for seven days and Augmentin twice daily for seven days to treat any infection.  She also ordered that Plaintiff's daily baths and changing of the dressings on his wounds to continue.

On September 11, 2014, Defendant Holland performed an evaluation of Plaintiff's gunshot wounds and surgical incision on his right leg.  The surgical incision was still draining but had less redness and appeared to be much better.  She ordered his prescriptions of antibiotics to continue for an additional seven days.

On September 18, 2014, Defendant Holland performed a follow up examination of the Plaintiff's injuries.  Plaintiff reported that he was feeling good, but that his right leg was stiff. The wounds on Plaintiff's back and abdomen were continuing to heal with no drainage.  She removed the staples on the upper portion of his surgical incision.  She did not remove the staples from the incision around the knee due to some continuing redness and drainage.  She ordered that his prescription antibiotics continue for an additional seven days and  Plaintiff's dry dressing to continue with daily changes.

On September 25, 2014, Defendant Holland removed all the remaining staples on Plaintiff's surgical incision on his right knee.  There was less redness on the knee, but there was a large amount of thick white substance.  All other wounds were healing well.  Plaintiff was

moved out of the lock-up observation cell and ordered to finish any remaining antibiotics.

On October 30, 2014, Defendant Holland examined the Plaintiff who was complaining of right knee swelling due to an increase in his activities.  Plaintiff was not in need of additional treatment due to the swelling as gradual improvement over time was anticipated.

On November 13, 2014, Defendant Holland examined Plaintiff who complained of swelling in his right knee with no increase in pain.  There was no warmth or redness appearing in the knee, but swelling was noted.  She ordered Plaintiff's Ibuprofen to stop due to his pale skin color which she suspected was caused by anemia.  She ordered Plaintiff be provided a warm pack for his knee twice daily and started him on daily B12 and iron supplements for his suspected anemia.

On November 28, 2014, Defendant Holland examined Plaintiff who complained of an enlarged, soft area of swelling on his left side.  Plaintiff had no history of injury to this location, but there appeared to be an 8-10 cm enlarged nodule which was soft, non-tender, compressible with no warmth or redness associated.  She felt this was due to a soft tissue injury or possible hernia.  No treatment was warranted.

On January 15, 2015, Defendant Holland examined Plaintiff who complained of a bulge in the center of his abdomen which he claimed had been there for two to three weeks.  Plaintiff indicated he was feeling fine.  It appeared Plaintiff had a soft hernia on one of his incisions.  This hernia could be reduced without pain.  It was also noted Plaintiff's color had improved although he still appeared to be pale.  No treatment was needed for his small incisional hernia, but an additional supplement of B12 was added to his prescription to improve his paleness.

On May 7, 2015, Defendant Holland treated Plaintiff for an abscess under his arm.  Plaintiff was provided a prescription of Bactrim DS for ten days.

7

According to Plaintiff's jail and medical records, he was released from custody on December 23, 2015.  Plaintiff was provided adequate medical and post-surgical care during Defendant Holland's employment with the Wagoner County Jail.  No follow-up consultation or derivative care in addition to what Plaintiff was provided during his incarceration was needed, necessary or warranted.  Plaintiff agrees that he was provided medical care by Defendant Holland.  He did not file any requests to staff or grievances regarding his medical care.  Defendant Holland did not examine the Plaintiff or any of his subsequent medical records following her separation from employment with the Wagoner County Sheriff's Office on August 1, 2015.

### III. ANALYSIS

### A. Plaintiff's 42 U.S.C. § 1983 Malicious Prosecution Claim Against Defendant Dorr

Unlike a false arrest claim, malicious prosecution concerns detention only "[a]fter the institution of legal process." *Wilkins v. DeReyes,* 528 F.3d 790, 798 (10th Cir. 2008).  A § 1983 malicious prosecution claim includes the following elements: (1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) no probable cause supported the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages. *Id.* at 799.  In this context, a Fourth Amendment violation can exist only when a plaintiff alleges the legal process itself to be wrongful.  If a plaintiff challenges merely the confinement *after* the institution of legal process, but not the process itself, "[t]he protections offered by the Fourth Amendment do not apply." *Jones v. City of Jackson,* 203 F.3d 875, 880 (5th Cir. 2000); *see also Taylor v. Waters,* 81 F.3d 429, 436 (4th Cir. 1996) ("[D]etermination of probable cause by a detached judicial officer that complies with the Fourth Amendment constitutes all of the process

due in order to constitutionally detain an accused pending trial.")  "If arrested without a warrant – and thus triggering the Fourth Amendment require[ment of] a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest, a plaintiff can challenge the probable cause determination made during the constitutionally-required probable cause hearing."  *See, e.g., Reed v. City of Chicago,* 77 F.3d 1049, 1053–54 (7th Cir. 1996) (concluding the plaintiff failed to state a malicious prosecution claim when he challenged only the warrantless arrest, but not the subsequent institution of legal process)."  *Wilkins v. DeReyes*, 528 F.3d 790, 798 (10th Cir. 2008).

> To prevail on a claim brought pursuant to § 1983, a plaintiff must demonstrate the defendant was both the but-for and proximate cause of the plaintiff's injury. *Trask v. Franco*, 446 F.3d 1036, 1046 (10th Cir. 2006).  Proximate cause can be established by showing the defendant set in motion events that he knew or should have known would cause the alleged deprivation of rights.  *Id.*  Just as in tort law, however, a defendant is not liable in a § 1983 action if there was a superseding cause of the constitutional violation.  *Id.*

> With respect to a § 1983 action for malicious prosecution, the "'principal player in carrying out a prosecution ... is not the police officer but prosecutor.'"  *Taylor v. Meacham*, 82 F.3d 1556, 1563 n. 8 (10th Cir. 1996) (quoting *Albright v. Oliver*, 510 U.S. 266, 279 n. 5, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (Ginsburg, J. concurring)).  Accordingly, an officer typically does not proximately cause a malicious prosecution because the independent decisions of the prosecutor in bringing the charge and the court in issuing an indictment or warrant constitute superseding causes that break the chain of causation.  *See id.* at 1564.  Nonetheless, officers are not shielded from liability if a causal connection can be established demonstrating that the prosecutor's and court's actions were not truly independent causes.  *Pierce v. Gilchrist*, 359 F.3d 1279, 1292–93 (10th Cir. 2004).  Most commonly, officers can be liable for malicious prosecution if they conceal or misrepresent material facts to the prosecutor, whose judgment was thereby influenced by the misstatements.  *Id.*

*Calvert v. Ediger*, 415 F.App'x. 80, 83 (10th Cir. March 4, 2011) (unpub).

Here, there is simply no evidence of any causal link between Defendant Dorr and the underlying criminal prosecution against Plaintiff, much less any evidence of malice on his part. Plaintiff alleges that Dorr prepared a probable cause affidavit which made omissions of material

facts, that said affidavit was misleading to the prosecutors, and unnecessarily prolonged his detention. [Dkt. 4, p. 11, ¶ 41; p. 15, ¶ 63 - p. 16, ¶66].  However, there is no evidence that any of the information allegedly omitted from the affidavit was material, that its omission rendered the affidavit misleading, or that any of the alleged information would have vitiated probable cause.

The Information charging Plaintiff with one count of assault and battery with a dangerous weapon and one count of assault with a deadly weapon was executed and filed of record in the Wagoner County District Court on August 19, 2014.  Defendant Dorr prepared three Probable Cause Affidavits - two of which were ultimately filed of record in the Wagoner County District Court.  One was executed by Dorr on August 19, 2014, sets forth possible criminal charges for the Plaintiff's assault of Larry Clark, and was filed of record in the Wagoner County District Court on September 3, 2014.  The second affidavit was executed by Dorr on August 19, 2014, sets forth possible criminal charges for the Plaintiff's assault of peace officers, and was not filed of record in the Wagoner County District Court.  The third affidavit was executed by Dorr on August 25, 2014, sets forth possible criminal charges for the Plaintiff's assault of Larry Clark and peace officers, and was filed of record in the Wagoner County District Court on September 3, 2014.  The narrative describing the underlying incident is identical in all three affidavits.

However, Plaintiff simply has no evidence that the District Attorney relied exclusively upon any of the affidavits in making the decision to file charges against the Plaintiff.  There is also no evidence that Defendant Dorr made any other sort of misleading statements to the District Attorney which led to the filing of the charges, no evidence that he had any other influence with the District Attorney with regard to the filing of said charges, or evidence that the District Attorney's decision to file the charges was not truly independent.  Nor is there any

10

evidence that the Probable Cause Affidavits caused any amended or additional charges to be brought against Plaintiff.  An Amended Information and Amended Second Page Information were subsequently filed on June 5, 2015; however, the filing did not alter or amend the charges against Plaintiff in any way, but rather amended the information regarding Plaintiff's prior convictions.[1]  Furthermore, the information which Plaintiff complains was omitted from the Probable Cause Affidavit was included in an Affidavit for Search Warrant which was executed on August 18, 2014 and filed of record in the Wagoner County District Court on August 25, 2014.  As such, there can be no reasonable argument that either the District Attorney or the Wagoner County Court were misled by the alleged omission of this information from the Probable Cause Affidavits.  Consequently, there can be no causal connection between the prosecution of the underlying criminal charges against Plaintiff and the preparation and filing of the Probable Cause Affidavits by Defendant Dorr.

Assuming, Plaintiff could establish the Probable Cause Affidavits had a causal connection to the prosecution of the criminal charges against Plaintiff, there is simply no indication the alleged omitted information would have vitiated probable cause if it had been included.  *See Taylor v. Meacham*, 82 F.3d 1556, 1562 (10th Cir. 1996) (where information has been omitted from an affidavit, the existence of probable cause is determined by examining the affidavit as if the omitted information had been included and inquiring if the affidavit would still have given rise to probable cause).

Here, Plaintiff alleges that Defendant Dorr omitted "all references to Gary's mental health status, he omitted the reason why Larry had called dispatch in the first instance, and he omitted the information indicating that law enforcement provoked the confrontation by shooting

---

[1]The District Attorney also made some oral amendments to the information at the preliminary hearing, but those amendments were not caused by or related to the Probable Cause Affidavit.

a mental health patient in the face with a high powered pepper ball launcher despite the lack of evidence of any imminent threat." [Dkt. 4, p. 11, ¶ 41]. First, Plaintiff's assertion that Defendant Dorr "omitted the information indicating that law enforcement provoked the confrontation" is conclusory and argumentative. The information upon which Plaintiff concludes that law enforcement provoked the confrontation (*i.e.* by shooting Plaintiff with a pepper ball launcher) is included in the affidavits. Likewise, Plaintiff's assertion that Defendant Dorr "omitted the reason why Larry had called dispatch in the first instance" is simply false. The affidavits clearly state "Deputy Lively further stated Gary had an argument with his brother Larry Clark earlier that resulted in Gary cutting Larry on the right side of his abdomen with the black handled knife."

Furthermore, the omission of Plaintiff's mental health status from the affidavits is not a material omission and would not have vitiated probable cause for the criminal charges against Plaintiff had such information been included in the affidavit. While a criminal defendant's mental health status may certainly be a defense to criminal charges, information regarding a defendant's mental health status simply is not material to the determination of probable cause to believe a defendant committed any particular crime. Persons with mental health issues are capable of committing crimes. Arresting officers are not constitutionally required to make a correct on the spot determination of whether a criminal suspect may ultimately be exonerated in criminal proceedings due to mental health factors before they can make a lawful warrantless arrest. Such a requirement would place an impossible burden upon officers. Mental health defenses are  not proper for consideration in a preliminary determination of whether probable cause exists. Indeed, at the preliminary hearing, the Wagoner County District Court Judge advised Plaintiff's criminal defense counsel that the issue of an insanity defense, or diminished

capacity defense, is an issue for a jury determination, not a preliminary hearing. (See Dkt. 94-7, p. 70:3-8). Accordingly, the omission of Plaintiff's mental health status from the affidavits was not material and would not have vitiated probable cause had it been included.

Plaintiff also argues that Defendant Dorr can be held liable for malicious prosecution under 42 U.S.C. § 1983 because he "prepared an affidavit that omitted facts detailing that all charges against Mr. Clark ultimately stemmed from Mr. Clark's use of force to repel someone who was attempting to enter his dwelling unlawfully." [Dkt. 111, p. 14]. In that regard, Plaintiff argues that the Oklahoma Self-Defense Act ("OSDA") "provides robust <u>immunity</u> from criminal prosecution to anyone who uses deadly force to repel a person who attempts an unlawful entry into their dwelling." [Dkt. 111, p. 16, citing Okla. Stat. tit. 21, § 1289.25].[2]

Plaintiff asserts that "by his own admission, Dorr testified that such information is relevant to a probable cause determination." [Dkt. 111, pp. 14-15]. However, the deposition testimony cited by Plaintiff does not support that assertion. Rather, Dorr merely answered in the positive counsel's question that such information would be "important" to know. Dorr did not admit that such information was relevant to a determination of probable cause in Plaintiff's underlying criminal case, nor that § 1289.25 was applicable to the facts surrounding Plaintiff's arrest and prosecution.

Plaintiff further argues:

Here, not only was the force used by Mr. Clark to repel his brother lawful in fact under the OSDA, Dorr made no effort to determine whether the force was justified and consistent with the OSDA despite his statutory obligation to do so prior to arresting Mr. Clark. Because Mr. Clark was entitled to <u>immunity</u> from arrest and prosecution but for Dorr's unlawful actions, the subsequent determination of probable cause at the preliminary hearing is not relevant.

---

[2] Plaintiff refers to § 1289.25 as the OSDA. However, the OSDA is actually codified elsewhere in the Oklahoma Statutes. *See* Okla. Stat. tit. 21, § 1290.1, *et seq*.

[Dkt. 111, p. 17].[3]

However, contrary to Plaintiff's assertions, Okla. Stat. tit. 21, § 1289.25 simply does not apply to the factual events underlying Plaintiff's arrest and prosecution.  That statute provides, in pertinent part:

> B. A person or an owner, manager or employee of a business is presumed to have held a reasonable fear of imminent peril of death or great bodily harm to himself or herself or another when using defensive force that is intended or likely to cause death or great bodily harm to another if:
>
> 1. The person against whom the defensive force was used was in the process of unlawfully and forcefully entering, or had unlawfully and forcibly entered, a dwelling, residence, occupied vehicle, or a place of business, or if that person had removed or was attempting to remove another against the will of that person from the dwelling, residence, occupied vehicle, or place of business; and
>
> 2. The person who uses defensive force knew or had reason to believe that an unlawful and forcible entry or unlawful and forcible act was occurring or had occurred.
>
> C. The presumption set forth in subsection B of this section does not apply if:
>
> 1. The person against whom the defensive force is used has the right to be in or is a lawful resident of the dwelling, residence, or vehicle, such as an owner, lessee, or titleholder, and there is not a protective order from domestic violence in effect or a written pretrial supervision order of no contact against that person;

Plaintiff has not produced any evidentiary material in support of his conclusory assertion that Larry Clark's attempted entry into the dwelling was unlawful.  Rather, the evidence conclusively demonstrates otherwise.  Larry had been the caretaker for his brother and held a general power of attorney for his brother for more than ten years. [Dkt. 94-7, p. 22:16 - p. 23:6; p. 42:9-10].  A few years before the subject incident, Larry had constructed the dwelling on his own property and allowed Plaintiff to live there.  On the date of the incident, Larry went to the

---

[3]Plaintiff has made no claim against Defendant Dorr for false arrest.  As such, his assertions regarding the allege lack of probable cause to arrest him and his alleged immunity from arrest under Okla. Stat. tit. 21, § 1289.25 are disregarded.

dwelling to see if Plaintiff wanted to go to the store as per their usual routine.  Larry did not knock on the door, but did make eye contact with Plaintiff through the window before attempting to enter.  There is no evidence that Plaintiff told Larry not to come in or otherwise communicated to Larry that he was not welcome. [Dkt. 94-7, p. 6:21 - p. 8:25; p. 9:19 - p. 10:10; p. 12:6-16; p. 15:1-23; p. 23:7-16; p. 28:12 - p. 29:5; p. 43:1-8].

These facts clearly show that Larry's attempted entry into the dwelling was not unlawful. Indeed, as the rightful owner of the property, Larry had an absolute right to be on the property, and § 1289.25 (C)(1) expressly exempts such a factual situation from the terms of the statute. Furthermore, even assuming that Larry's attempted entry into the dwelling had been unlawful, the statute also requires that it be "forceful."  However, there is absolutely no evidence that Larry attempted to enter the residence forcefully.  Rather, he merely opened an unlocked door. [Dkt. 94-7, p. 28:12 - p. 29:5; p. 43:1-8].  As the terms of § 1289.25 do not apply to the underlying factual events, the omissions of this information from the affidavits is not material and would not have vitiated probable cause for the criminal charges against Plaintiff had it been included. Consequently, there can be no causal connection between the prosecution of the underlying criminal charges against Plaintiff and the preparation and filing of the affidavits by Defendant Dorr.

Moreover, Plaintiff has failed to produce any evidentiary material indicating malice on the part of Defendant Dorr as necessary for a claim of malicious prosecution.  In that regard, Plaintiff asserts that "Because Dorr knew the OSDA was implicated by the events...his failure to comply with the OSDA supports the inference that Dorr acted deliberately and recklessly in concealing the information." [Dkt. 111, p. 17]  However, as discussed above, § 1289.25 was not implicated by the underlying factual events, nor does Plaintiff cite to any evidence indicating

that Dorr believed that it was.

On January 27, 2015, a preliminary hearing was held in Wagoner County District Court Case No. CF-14-421 at which Plaintiff was represented by counsel.  During the hearing, the court heard extensive testimony regarding the reasons that Larry Clark called the Sheriff's Office about Plaintiff on August 18, 2014, and about Plaintiff's mental health status on that date. However, even after hearing this testimony, the Wagoner County District Court found that probable cause existed to believe Plaintiff had committed the crimes alleged in the Information and bound Plaintiff over for trial.  Such an adversarial preliminary hearing at which a judge independently listens to testimony, evaluates the credibility of witnesses, reviews evidence, and finds the existence of probable cause sufficient to bind a defendant over for trial, breaks the "chain of causation" for a § 1983 malicious prosecution claim.  *See Taylor*, 82 F.3d at 1564.

Accordingly, Defendant Dorr is entitled to summary judgment with regard to Plaintiff's §1983 malicious prosecution claim.

## B. Plaintiff's 42 U.S.C. § 1983 Medical Deliberate Indifference Claim Against Defendant Holland

Plaintiff was discharged from the St. John Medical Center on August 29, 2014, by Certified Nurse Practitioner Brandon King, APRN-CNP.    Plaintiff's Clinical Discharge Instructions advised that he should have a follow-up with Jules Dumais of Tulsa Bone and Joint within 7-10 days, follow-up with St. John Trauma Service as needed - only if needed, follow-up with Barry Eisen of St. John Clinic - Gastroenterology as needed, and a follow-up with his primary care provider within 3-4 days.  Plaintiff alleges that Defendant Holland was deliberately indifferent to Plaintiff's serious medical needs by disregarding those instructions for follow-up care.  However, Plaintiff cannot demonstrate deliberate indifference on the part of Defendant Holland.

The Eighth Amendment requires prison officials to provide humane conditions of confinement, including access to the basic necessities of health care. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). The United States Supreme Court has made clear that "deliberate indifference to serious medical needs of prisoners" may amount to a violation of the Eighth Amendment and state a cause of action under 42 U.S.C. § 1983. *See Estelle*, 429 U.S. at 104. However, mere negligence – even gross negligence – is insufficient to support a claim of deliberate indifference under § 1983. *Berry v. City of Muskogee, Oklahoma*, 900 F.2d 1489, 1495 (10th Cir. 1990). "It is obduracy and wantonness, not inadvertence or error in good faith," that violate the Constitution with regard to the "supplying of medical needs..." *Whitley v. Albers*, 475 U.S. 312, 319 (1986). A § 1983 claim alleging inadequate or delayed medical care involves "both an objective and subjective component, such that [the Court] must determine both whether the deprivation is sufficiently serious and whether the government official acted with a sufficiently culpable state of mind." *Oxendine v. R.G. Kaplan, M.D.*, 241 F.3d 1272, 1276 (10th Cir. 2001).

As to the objective component, a medical need is considered sufficiently serious if a physician has diagnosed the condition and mandated treatment, or the condition is so obvious that even a lay person would easily recognize the medical necessity for a doctor's attention. *Oxendine,* 241 F.3d at 1276. A plaintiff must further demonstrate that the defendant's failure to timely meet that objective medical need caused him to suffer substantial harm. *Id*. at 1276-77. As to the subjective prong of this test, a plaintiff must establish that a defendant knew of a substantial risk of harm and failed to take reasonable measures to abate it. *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999) (quoting *Farmer*, 511 U.S. at 847). In that regard, a plaintiff must show that the defendant was "aware of facts from which the inference could be drawn that

17

a substantial risk of serious harm exists" and that the defendant actually drew that inference. *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (quoting *Farmer*, 511 U.S. at 837).

In the instant case, Plaintiff cannot demonstrate that Defendant Holland was subjectively aware of a substantial risk of harm to Plaintiff's health from the failure to take Plaintiff to these follow-up appointments, or that she disregarded that risk. First, as stated *supra,* it is undisputed that Plaintiff's discharge papers did not mandate any specific medical procedures; rather, they merely recommended Plaintiff receive general follow-up visits to outside medical providers.

Plaintiff was first booked into jail following his injury on August 29, 2014. During his initial inmate intake and medical screening, Plaintiff indicated that he did not have any pain, injury or medical condition that required the care of a doctor.

Defendant Holland was not scheduled to work in the Wagoner County Jail on August 29, 2014. However, shortly after the Plaintiff was booked into the Wagoner County Jail, she received his Clinical Discharge Instructions from St. John Medical Center. After her review of the discharge instructions, she called the discharging nurse practitioner, Brandon King, APRN-CNP, to discuss the Plaintiff's medical care and treatment needs. During her conversation with Brandon King, APRN-CNP, she took notes on the discharge paperwork. She also verified the Plaintiff's current prescriptions. Brandon King, APRN-CNP, confirmed that there was no need for follow up care with any other doctor or specialist at the time since the Plaintiff would be in Defendant Holland's care during his incarceration. From the time of Plaintiff's incarceration in the Wagoner County Jail from August 29, 2014 until her last day working in the jail on August 1, 2015, Defendant Holland examined the Plaintiff on ten occasions.

In light of these undisputed facts, Plaintiff simply cannot demonstrate that Defendant Holland was subjectively aware of a substantial risk of harm to Plaintiff's health from the failure

to take Plaintiff to follow-up appointments as indicated in the Plaintiff's discharge instructions, or that she disregarded any such risk. To the contrary, Plaintiff was provided thorough and adequate medical and post-surgical care by Defendant Holland herself. No follow-up consultation or derivative care in addition to what Plaintiff was provided during his incarceration was needed, necessary or warranted. Plaintiff agrees that he was provided medical care by Defendant Holland, and he did not file any requests to staff or grievances regarding his medical care. As an APRN-CNP, Holland was competent to provide such care. While pre-trial detainees have a right to the provision of adequate medical care, they are not entitled to receive such care from any specific provider, and Plaintiff has no evidence that the medical providers listed in his discharge instructions would have provided care which was substantially different from the care provided by Defendant Holland herself.

Plaintiff argues that Defendant Holland can held liable under 42 U.S.C. § 1983 for delaying or failing to fulfill her role as gatekeeper for other medical personnel capable of providing the "appropriate level" of medical care to Plaintiff. Specifically, Plaintiff argues that Plaintiff's discharge instructions directed follow-up care with Dr. Dumais, the orthopedic surgeon who performed surgery on Plaintiff's knee, and that Holland was not qualified to provide the same level of care as Dr. Dumais.

However, Holland was not functioning merely as a gatekeeper with regard to Plaintiff's medical care. Rather, as an Advanced Practice Registered Nurse-Certified Nurse Practitioner (APRN-CNP), Holland was qualified and acted as a primary care provider.

> ...[T]he subjective component is not satisfied, absent an extraordinary degree of neglect, where a doctor merely exercises his considered medical judgment. Matters that traditionally fall within the scope of medical judgment are such decisions as whether to consult a specialist or undertake additional medical testing. See, e.g., *Ledoux v. Davies*, 961 F.2d 1536, 1537 (10th Cir. 1992) (noting that types of medication prescribed and referrals to specialists are generally

matters of medical judgment). The Eighth Amendment's prohibition on cruel and unusual punishment is not violated when a doctor simply resolves "the question whether additional diagnostic techniques or forms of treatment is indicated." Estelle, 429 U.S. at 107, 97 S.Ct. 285.

A claim is therefore actionable only in cases where the need for additional treatment or referral to a medical specialist is obvious. And obviousness in the circumstances of a missed diagnosis or delayed referral, while not subject to a precise formulation, requires direct or circumstantial evidence that can arise in several different contexts: (1) a medical professional recognizes an inability to treat the patient due to the seriousness of the condition and his corresponding lack of expertise but nevertheless declines or unnecessarily delays referral, e.g., a family doctor knows that the patient needs delicate hand surgery requiring a specialist but instead of issuing the referral performs the operation himself; see, e.g., *Oxendine*, 241 F.3d at 1279; (2) a medical professional fails to treat a medical condition so obvious that even a layman would recognize the condition, e.g., a gangrenous hand or a serious laceration; see id.; and (3) a medical professional completely denies care although presented with recognizable symptoms which potentially create a medical emergency, e.g., a patient complains of chest pains and the prison official, knowing that medical protocol requires referral or minimal diagnostic testing to confirm the symptoms, sends the inmate back to his cell. See, e.g., *Mata*, 427 F.3d at 755–59; *Sealock*, 218 F.3d at 1211–12...

\*\*\*\*\*\*

...In the end, the "negligent failure to provide adequate medical care, even one constituting medical malpractice, does not give rise to a constitutional violation." *Perkins v. Kan. Dep't of Corrections*, 165 F.3d 803, 811 (10th Cir. 1999). So long as a medical professional provides a level of care consistent with the symptoms presented by the inmate, absent evidence of actual knowledge or recklessness, the requisite state of mind cannot be met. Indeed, our subjective inquiry is limited to consideration of the doctor's knowledge at the time he prescribed treatment for the symptoms presented, not to the ultimate treatment necessary. See *Mata*, 427 F.3d at 753 (opining that the symptoms presented at the time the physician has contact with the patient is relevant to the subjective inquiry only; objective seriousness is based on the ultimate harm presented).

*Self v. Crum*, 439 F.3d 1227, 1232-33 (10th Cir. 2006).

Plaintiff cannot demonstrate that it should have been obvious to Holland that Plaintiff required any specialized care that she could not provide herself as discussed in *Self*, *supra*. Plaintiff's discharge instructions did not identify any specific medical care to be provided by Dr.

20

Dumais. Rather, it merely directed a general "follow-up" visit with him within 7 to 10 days. Dr. Dumais characterized the instructions to follow up with him in seven to ten days as "kind of a generic follow-up." [Dkt. 140-1, Depo., p. 56:8 to 57:2]. Dr. Dumais further testified that it is possible for a patient to receive adequate postoperative care without following up with him, but that he would "feel more comfortable" with such follow-up to "insure that things are progressing appropriately." [Dkt. 140-1, Depo., p. 126:20 to 127:4]. After her review of the discharge instructions, Holland called the discharging nurse practitioner, Brandon King, APRN-CNP, to discuss the Plaintiff's medical care and treatment needs. During her conversation with Brandon King, APRN-CNP, she took notes on the discharge paperwork. She also verified the Plaintiff's current prescriptions. Brandon King, APRN-CNP, confirmed that there was no need for follow-up care with any other doctor or specialist at the time since Plaintiff would be in Defendant Holland's care during his incarceration. Dr. Dumais confirmed that APRN-CNPs are qualified to provide primary care independent of a physician. [Dkt. 140-1, Depo., p. 37:10-15]. Dr. Dumais further testified that a properly trained nurse practitioner could provide adequate postoperative care on a patient such as Plaintiff. [Dkt. 140-1, Depo., p. 55:1-14]. Dr. Dumais confirmed that nurse practitioners are qualified to prescribe the sorts of medications which were prescribed to Plaintiff, to remove surgical staples, to inspect a wound for infection or edema, and to order blood tests and x-rays. [Dkt. 140-1, Depo., p. 62:17 to 63:25]. Dr. Dumais further testified that he does not always see his patients for postoperative care, but often relies upon nurse practitioners who provide such postoperative care to his patients to relay any issues to him. [Dkt. 140-1, Depo., p. 35:9-23]. Holland determined in her medical opinion that no follow-up consultation or derivative care in addition to what Plaintiff was provided during his incarceration was needed, necessary or warranted.

Plaintiff argues that it should have been obvious to Defendant Holland that Plaintiff had an infection, that his condition did not adequately improve, and that the need for specialist care was obvious. However, Holland's medical records indicate that Plaintiff was making steady, but slow, progress. Dr. Dumais refused to testify that it would be obvious to a reasonable medical provider that Plaintiff had a complication which needed to be addressed by a specialist, stating that such testimony would be speculation. Rather, he testified that, in his opinion, "if there's concern over a surgical wound several weeks out, and even over a month out from surgery…that would warrant evaluations by a surgeon. [Dkt. 140-1, Depo., p. 131:8 to 132:2]. It is not clear what Dr. Dumais meant by "concern over a surgical wound" and he did not clarify this statement at the deposition. While he testified that any such concern warranted evaluation by a surgeon, he did not testify that such specialized care was necessary. In any event, Dr. Dumais certainly did not testify that it would have been obvious to a reasonable medical provider that Plaintiff had a complication which needed to be addressed by a specialist. Indeed, Dr. Dumais could not even testify that Holland had transgressed the lesser standard of general medical negligence. [Dkt. 140-1, Depo., p. 132:18 to 141:22]. As Plaintiff has no competent expert medical evidence to support his claim that it should have been obvious to Holland that he needed specialized care, his fails.

Even if Plaintiff could demonstrate that the need for specialized care should have been obvious to Holland, he still cannot demonstrate that he suffered any detrimental effects as a result of Holland's actions. *See Cabeen v. Thomas*, 409 Fed. Appx. 776, 778 (5th Cir. 2011) (unpub) (holding that dismissal of inmate's medical deliberate indifference claim regarding jail staff's alleged failure to take him to neurological appointments was not error where there was no allegation that he suffered any harm as a result of missed appointments). Dr. Dumais suspects

22

that Plaintiff has a deep chronic infection, but has not verified that and has not taken a culture which would allow him to make such a diagnosis. [Dkt. 140-1, Depo., p. 72:24 to 73:4; p. 89:14-25; p. 93:25 to 94:3; Dkt. 140-3]. Dr. Dumais testified that deep, chronic bone infections of the type that he suspects that Plaintiff has do not make the patient actively sick, and are "not something that needs to be immediately treated." [Dkt. 140-1, Depo., p. 69:17 to 70:4]. Regardless, Dr. Dumais could not testify with any degree of medical certainty as to when Plaintiff may have contracted any such deep infection. [Dkt. 140-1, Depo., p. 73:10-19]. Furthermore, he could not say with any degree of medical certainty whether any such infection could have been avoided. [Dkt. 140-1, Depo., p. 98:20 to 99:9]. Dr. Dumais also cannot testify with any degree of medical certainty when the hardware in Plaintiff's knee failed. He testified that it may have failed as late as 3-4 months prior to his evaluation of Plaintiff on April 20, 2016, which would have been long after Defendant had last provided any care for Plaintiff. [Dkt. 140-1, Depo., p. 84:25 to 88:6; Dkt. 140-3; Dkt. 94, p.13, ¶ 32]

At least some of Plaintiff's complications may have been cause by Plaintiff himself. On August 26, 2014, Physician's Assistant Nicole Mancinelli prepared a Progress Note stating that Plaintiff continually kept taking off his knee brace and bandages and was not compliant with recommended restrictions regarding non-weight bearing on his right leg and wearing the knee brace. Likewise, on August 29, 2014, PA Mancinelli prepared a Progress Note stating that Plaintiff continued to be noncompliant with regard to those recommended restrictions. Dr. Dumais testified that further harm to Plaintiff's tibia fracture and displacement of the hardware was a risk of Plaintiff's noncompliance with those restrictions. [Dkt. 140-1, Depo., p. 46:2 to 47:16; p. 50:9 to 51:12; Dkt. 140-4; Dkt. 140-5]. Plaintiff also had significant pre-existing arthritis of the most severe level in his knee prior to his surgery, and this may have had an

impact on him regaining function of the joint. [Dkt. 140-1, Depo., p. 29:4 to 32:10; Dkt. 140-6].

Moreover, every complication which Dr. Dumais identified in his evaluation of Plaintiff on April 20, 2016, was within the scope of inherent risks of Plaintiff's initial surgery. [Dkt. 140-1, Depo., p. 98:11-15).   Dr. Dumais testified that continuing pain was an inherent risk of Plaintiff's surgery, even if everything healed properly. [Dkt. 140-1, Depo., p. 22:10-16; 23:5-10; Dkt. 140-6].   Dr. Dumais also testified that infection, failure of the tissues to heal properly, failure of the hardware, decreased range of motion, posttraumatic arthritis, and the need for further surgery were all inherent risks of Plaintiff's surgery, even if the patient was provided perfect care.  [Dkt. 140-1, Depo., p. 23:11 to 28:11; Dkt. 140-6].  Plaintiff was informed of these risks prior to his surgery and gave informed consent. [Dkt. 140-1, Depo., p. 21:4 to 22:5; p. 28:12-21; p. 98:16-19; Dkt. 140-6].

Plaintiff  has no competent medical evidence that he suffered any detrimental effects as a result of Holland providing post-operative care herself rather than through follow-up visits with outside medical providers.

Plaintiff further argues that no physical therapy was provided to him in the jail and that the failure to provide such care "supports the inference that [his] condition worsened because Holland did not provide him with access to necessary medical care for which Holland is liable." [Dkt. 111, p. 22].  However, these allegations are beyond the scope of Plaintiff's deliberate indifference claim set forth in his Amended Complaint.  In the Amended Complaint, Plaintiff's claim against Holland is based solely upon allegations that she disregarded instructions regarding follow-up care for Plaintiff set forth in his hospital discharge papers. [Dkt. 4, p. 10, ¶ 36; p. 17, ¶ 74 - p. 18, ¶ 79].  There are no allegations in the Amended Complaint regarding any failure to provide physical therapy to Plaintiff by Holland and there is no evidence that

24

Plaintiff's discharge instructions directed any such physical therapy.

Moreover, there is no evidence of deliberate indifference on the part of Holland with regard to Plaintiff's alleged failure to receive physical therapy during his detention in the Wagoner County Jail.  It is undisputed that Holland instructed the medical staff and jailers to walk the Plaintiff every three hours.  However, Plaintiff has failed to cite to any evidentiary material which implicates Holland in any failure of the jailers to follow out her orders in that regard, nor is there any evidence that Holland was aware that jailers were not following those orders and did nothing about it.

Accordingly, Defendant Holland is entitled to summary judgment with regard to Plaintiff's § 1983 deliberate indifference claim.

### C. Qualified Immunity

Defendants have asserted that they are entitled to qualified immunity.  Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." *Harlow v. Fitzgerald,* 457 U.S. 800, 807 (1982).  It provides "ample protection to all but the plainly incompetent or those who knowingly violate the law."  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. at 818). Qualified immunity also shields officers who have "reasonable, but mistaken beliefs," and operates to protect officers from the sometimes "hazy border[s]" of the law. Saucier v. Katz, 533 U.S. 194, 205 (2001). When a defendant asserts qualified immunity, the plaintiff bears the

heavy burden of demonstrating: (I) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time. *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). The court "has discretion to determine 'which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.'" *Id.* (quoting *Pearson*, 555 U.S. at 129). In this case, because Defendants did not violate Plaintiff's constitutional rights, this Court need not address whether those rights were clearly established. Accordingly, Defendants are entitled to qualified immunity and summary judgment is granted in their favor.

**IT IS SO ORDERED this 18th day of July, 2017.**

James H. Payne
United States District Judge
Eastern District of Oklahoma