**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| (1)  GARY CLARK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 16-CV-115-JHP |
| | ) | |
| (2)  ROBERT COLBERT, in his official | ) | |
| and individual capacity as Sheriff of | ) | |
| Wagoner County, Okla., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Now before the Court is the Defendant Board of County Commissioners of the County of Wagoner's ("Board") Motion for Summary Judgment [Dkt. 95].  After consideration of the pleadings, affidavits, and briefs, the Court grants the Board's motion.

## I. STANDARD OF REVIEW

Rule 56(a) of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Summary judgment is not a disfavored procedural shortcut, but an integral part of the federal rules as a whole. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986), the Supreme Court held that "there is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." The Court further held that "if the evidence is merely colorable, or not significantly probative, summary judgment may be granted." *Id.* In addition, the *Anderson* Court stated that "the mere existence of a scintilla of evidence in support of a plaintiff's position will be insufficient; there must be evidence on which a jury could reasonably find for the plaintiff." *Id.* A movant's summary judgment burden may properly be met by

reference to the lack of evidence in support of plaintiff's position. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex*, 477 U.S. at 325).

Furthermore, as described by the court in *Cone v. Longmont United Hosp. Ass'n.*, 14 F.3d 526 (10th Cir. 1994), "Even though all doubts must be resolved in (the nonmovant's) favor, allegations alone will not defeat summary judgment." *Cone* at 530 (citing *Celotex*, 477 U.S. at 324). *See also Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991); *Roemer v. Pub. Serv. Co. of Colo.*, 911 F. Supp. 464, 469 (D. Colo. 1996). Moreover, "(i)n response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).

## II. UNDISPUTED FACTS

After review of the evidentiary material submitted by the parties, the Court finds that there are no material disputes as to the following facts:

On Monday, August 18, 2014, at approximately 3:34 p.m., Larry Clark called the Wagoner County Sheriff's Office ("WCSO") and advised the dispatcher that he needed to have an officer dispatched to his residence at 9501 S. Hillcrest Dr., Broken Arrow, Oklahoma, because he had been assaulted by his brother, Plaintiff Gary Clark. Mr. Clark advised the dispatcher that Plaintiff lived in small cottage on his property, that there was a dog in the cottage, that Plaintiff was a schizophrenic patient and was off his medications, and that Plaintiff had lunged at him with a knife and tried to stick him. Plaintiff had, in fact, cut Larry on his right side with the knife.

Wagoner County Deputy Robbie Lively arrived on the scene at approximately 3:58 p.m. - about 30 seconds before Wagoner County Deputy Jason Hathcoat. They met with Larry Clark

who told them that Plaintiff had assaulted him with a knife.  Deputies Hathcoat and Lively walked around to the north side of the residence, where they observed Plaintiff standing on the front porch of the cottage holding a large black-handled kitchen knife, approximately 10 inches in length.  Deputies Hathcoat and Lively tried to talk to Plaintiff, but he would not respond to them verbally. They asked him numerous times to drop the knife, but he would not respond to their commands. Plaintiff used his hand to wave at the deputies to come and get him, flipped off the deputies, clinched his fist and stuck his finger out and his thumb up and acted as though he were shooting a gun toward the deputies, and rubbed his open hand back and forth along the knife.  Deputies Hathcoat and Lively then backed away from Plaintiff and called for back-up, while keeping Plaintiff in sight.

Defendant Wagoner County Major Dustin Dorr arrived at the scene at approximately 4:08 p.m. After being briefed on the situation, Dorr, Hathcoat, and Lively approached Plaintiff and again attempted to get him to put down the knife. Plaintiff remained silent, but continued to make the same sort of hand gestures. Plaintiff would also hold the knife to his own throat at times.  Defendant Dorr advised Deputy Hathcoat to have dispatch contact the Broken Arrow Police Department ("BAPD") for their assistance and for the use of less-lethal resources. Defendant Dorr continued to try and communicate with Plaintiff for approximately 10-12 minutes and coax him to put down the knife. Plaintiff did not respond with anything other than the same sort of hand gestures. He did not put down the knife.

BAPD patrol units began arriving at the scene at approximately 4:21 p.m.  Defendant Dorr was contacted by Wagoner County Major Handley and told to hold his position until Handley and Wagoner County Sheriff Robert Colbert got there.  Broken Arrow Captain Patrick DuFriend arrived at the scene at approximately 4:30 p.m. and was briefed on the situation by

BAPD Officer Wylie and Defendant Dorr.

Wagoner County Major Handley and Sheriff Colbert arrived at the scene at approximately 4:38 p.m., and Defendant Dorr briefed Sheriff Colbert on the facts. Sheriff Colbert then tried to speak to Plaintiff, but Plaintiff did not respond, aside from making the same sorts of hand gestures. Sheriff Colbert then turned to Broken Arrow Captain DuFriend and gave him command of the operation. From that point on, Captain DuFriend took command of the scene and issued all directives.

Captain DuFriend made a tactical plan to take Plaintiff into custody with BAPD officers using less-lethal force in the form of a pepperball launcher, tasers, and a ballistic shield, and Wagoner County personnel who had first responded to the scene providing lethal back-up with their firearms. Defendant Dorr was tasked with detaining Plaintiff after he had been disarmed. The plan was to use pepperballs to try and subdue the Plaintiff, get him to drop the knife, and detain him. Tasers were available to utilize if he charged at the officers. Captain DuFriend made the decision not to attempt to wait Plaintiff out any further as officers had been on the scene for nearly an hour and had made no progress in communicating with Plaintiff or convincing him to surrender the knife.

Captain DuFriend directed the officers to get into a "half-horseshoe" formation in front of the cottage. The formation consisted of Deputies Hathcoat and Lively, Defendant Dorr, and the BAPD officers that were present. Broken Arrow Captain DuFriend carried a ballistic shield. The Sheriff and Wagoner County Major Handley were not part of the formation. They were by the side of the house 15-20 feet behind the other officers. BAPD Officer Smith was armed with a rifle and positioned on Larry Clark's back porch. BAPD also had a K9 officer with a police dog positioned nearby.

4

Defendant Dorr then told Plaintiff that he was under arrest for assaulting his brother. Plaintiff remained silent and did not drop the knife. Members of the Broken Arrow Police Department also told Plaintiff that he was under arrest and commanded him to drop the knife. Plaintiff did not respond to their commands, but continued to make hand gestures toward the officers. While Plaintiff was still standing on his porch, the group moved forward a little and Captain DuFriend directed Broken Arrow Sergeant Blevins to deploy the pepperballs. Blevins fired a volley of pepperballs at Plaintiff. Some hit the cottage building, some hit the ground around Plaintiff, and some hit Plaintiff. The pepperballs had no apparent effect on Plaintiff. Captain DuFriend directed Blevins to fire a second volley of pepperballs. Again, some of the pepperballs hit the cottage building, some hit the ground around Plaintiff, and some hit Plaintiff, with no apparent effect on Plaintiff. Further verbal commands to drop the knife were given during this process, but Plaintiff did not comply. He continued making hand gestures to the officers.

As the pepperballs had no apparent effect on Plaintiff, Captain DuFriend directed the group to move back to its original position. Plaintiff then stepped off the porch, knife still in hand, and started to charge the group of officers with the knife extended out in front of him. He did not appear to be moving blindly, but rather purposefully toward the officers. The group continued to move back, but Plaintiff was quickly gaining on them. When Plaintiff was about twenty or twenty-five feet from the group, Broken Arrow Officers Wylie and Gibson fired their Tasers at Plaintiff. This had no effect on Plaintiff and he continued to charge the group. When Plaintiff was about ten feet from the group, someone gave the instruction to fire. Deputies Hathcoat and Lively, and Broken Arrow Officer Smith fired their weapons at Plaintiff. Deputy Lively fired his weapon three or four times. Plaintiff was hit and fell to the ground, still clutching

5

the knife.

After a few seconds, Plaintiff attempted to get up, but Officer Gibson, who still had Taser probes attached to Plaintiff, re-energized the Taser and Plaintiff experienced another shock at the direction of Captain DuFriend. At this point, Plaintiff let go of the knife and it was secured. Defendant Dorr then moved in and placed handcuffs on the Plaintiff. Broken Arrow EMS was summoned and Plaintiff was transported to the hospital.

After the incident, Larry Clark prepared a Voluntary Statement which described Plaintiff as presenting "a danger to himself and others."  Defendant Dorr considered Plaintiff to be a threat to officers on the scene, himself, and others in the vicinity while he had the knife in his possession. Dorr was concerned that Plaintiff could have left the porch at any moment which would have created a more dangerous situation.  Deputy Lively viewed Plaintiff as a danger to himself and to the officers on the scene. He could have quickly gotten to any of the officers with the knife, or he could have easily harmed himself with it. He was also just two steps away from the cottage and could have gotten into the cottage before officers could have gotten to him. The officers had no idea what was inside the cottage.  Deputy Hathcoat believed that Plaintiff was a threat.  Captain DuFriend also believed that Plaintiff was a direct threat to officers on the scene and others in the vicinity.

The WCSO did not have a crisis intervention team at the time of the incident.  The BAPD also does not have a crisis intervention team. At the time of the incident, BAPD had a few officers who had received additional training in dealing with individuals with mental health issues. Captain DuFriend did not advise the Sheriff or any other WCSO personnel of the existence or availability of such officers.  Captain DuFriend did not think there was a need for a crisis intervention team, or that calling out such a team or officers trained in crisis intervention

6

would have made any difference in this situation.

Plaintiff's mental health status was not a primary concern of Deputies Hathcoat and Lively and Defendant Dorr in their interactions with Plaintiff at the scene. Rather, they were faced with an immediate threat situation where it had been reported that the suspect had assaulted his brother with a knife, where he had a knife, and where he would not comply with orders to drop the knife. In that specific scenario, the officers' primary concern was disarming the suspect and detaining him in order to eliminate the immediate threat he posed. In that regard, the officers did not treat Plaintiff differently than any other similarly situated suspect without a mental disability. Likewise, Captain DuFriend testified that Plaintiff's mental health status was not a significant factor in his treatment of Plaintiff and would not have made any difference because he was under arrest for a felony crime, he was noncompliant and armed, and he continued to pose a threat to officers and others.

The WCSO had a Conduct and Behavior policy which prohibited employees from discriminating against any person on the basis of disability.  The WCSO had a Use of Force Policy which provides that the protection of human life is the highest priority of the agency, that officers are responsible for the protection of the lives of citizens, fellow officers and themselves, and that all other duties are subservient to the duty to protect human life. The policy provides that officers shall only use force that is objectively reasonable and necessary in the performance of their duties and that the reasonable level of force is to be determined by the circumstances of a particular situation. The policy provides that deadly force may only be used when an officer has probable cause to believe that a suspect poses a significant threat of death or serious physical injury to others or the officer, and that all lesser threats must addressed with non-deadly force. The policy further contains definitions of levels of resistance and control, and specific

procedures for the use of force, including escalation and de-escalation of force.

Deputies Hathcoat and Lively and Defendant Dorr are all CLEET certified and receive a minimum of two hours of mental health training a year as a requirement of continued CLEET certification. In his training, Defendant Dorr was taught how to recognize the signs of mental illness, to use de-escalation techniques when dealing with the mentally ill, to use soft words and non-threatening language when dealing with the mentally ill, and about the prevalence of mental illness in society.

## III. ANALYSIS

### A. Plaintiff's ADA Claim

The Defendant Board is not a proper party to Plaintiff's ADA claim. After arriving at the scene Sheriff Colbert gave BAPD Captain DuFriend command of the operation. From that point on, Captain DuFriend took command of the scene and issued all directives. It was Captain DuFriend who made the tactical plan to take Plaintiff into custody with BAPD officers using less-lethal force in the form of a pepperball launchers, tasers, and a ballistic shield, and Wagoner County personnel who had first responded to the scene providing lethal back-up with their firearms. It was Captain DuFriend who directed the other officers in carrying out the plan. Captain DuFriend is an officer of the City of Broken Arrow, not Wagoner County. Plaintiff argues that, pursuant to Oklahoma law, the Board assumed legal responsibility for the actions of BAPD officers who responded to the county's request for assistance. However, as discussed more thoroughly in section III, subpart B below, Plaintiff's argument in this regard is without legal or factual support. Accordingly, the City of Broken Arrow is the only proper party to Plaintiff's ADA claim, not the Defendant Board.

Even if the Defendant Board were a proper party to Plaintiff's ADA claim, it would still

be entitled to summary judgment with regard thereto. In *Gohier v. Enright*, 186 F.3d 1216 (10th Cir. 1999), the Tenth Circuit rejected a categorical exclusion of arrests from ADA Title II. However, it specifically held that it was still an open question in this Circuit whether to adopt either of two potential theories of liability. *Id*. at 1221. The first such theory of liability - the "wrongful arrest theory" - involves circumstances where police misperceive lawful conduct caused by a person's disability as criminal activity – such as where police arrest a stroke victim for drunk driving because they have mistaken the symptoms of his disability for intoxication. The *Gohier* court declined to consider this theory of liability finding that the theory did not apply to the facts before them – the officer did not misperceive lawful conduct caused by the decedent's disability as criminal activity and arrest him for it, the decedent's conduct was not unlawful, and the officer did not arrest him. *Id*. 1222. Likewise, in this case, this theory of liability does not apply to the factual circumstances and Plaintiff does not proceed under this theory of liability.

The second theory of liability which the court discussed in *Gohier* was the "reasonable-accommodation-during-arrest" theory. In that regard, the court stated that "Gohier might have argued that Title II required Colorado Springs to better train its police officers to recognize reported disturbances that are likely to involve persons with mental disabilities, and to investigate and arrest such persons in a manner reasonably accommodating their disability." *Id*. In order to recover under such a theory, a plaintiff would have to show that they suffered "greater injury or indignity" in the arrest process than other arrestees. *Id*. at 1220-1221 (citations omitted). However, the court also declined to adopt this theory of liability because the plaintiff in that case had affirmatively disclaimed reliance on such a theory, thus, leaving the applicability of either theory of liability an open question in the Tenth Circuit. *Id*. Plaintiff in this case proceeds

upon the "reasonable-accommodation-during-arrest" theory of liability. However, the Court declines to adopt such a theory of liability under the facts of this case.

The Fifth and Sixth Circuits have addressed factually similar cases and have found that reasonable accommodations are not required when the suspect creates exigent circumstances by threatening officers or civilians. In *Hainze v. Richards*, 207 F.3d 795 (5th Cir. 2000), a woman called 911 requesting that the police transport her suicidal nephew to a hospital for mental health treatment. The woman advised the 911 dispatcher that Hainze was under the influence of alcohol and anti-depressants, carrying a knife, and threatening to commit suicide. Three police officers responded and went to a convenience store where Hainze was located. Upon arrival, the officers saw Hainze standing beside a truck holding a knife. One of the officers exited his vehicle and drew his gun, and ordered Hainze to step away from the truck. Hainze responded with profanities and started walking towards the officer. The other two officers then exited their vehicles with their guns drawn. The first officer twice ordered Hainze to stop, but Hainze ignored him. When Hainze was within four to six feet of the first officer, the officer fired two shots into his chest. EMS was summoned to the scene and Hainze survived. *Id*. at 797. The Fifth Circuit held that ADA Title II did not apply under these circumstances:

> Despite Hainze's claims, we hold that Title II does not apply to an officer's on-the-street responses to reported disturbances or other similar incidents, whether or not those calls involve subjects with mental disabilities, prior to the officer's securing the scene and ensuring that there is no threat to human life. Law enforcement personnel conducting in-the-field investigations already face the onerous task of frequently having to instantaneously identify, assess, and react to potentially life-threatening situations. To require the officers to factor in whether their actions are going to comply with the ADA, in the presence of exigent circumstances and prior to securing the safety of themselves, other officers, and any nearby civilians, would pose an unnecessary risk to innocents. While the purpose of the ADA is to prevent the discrimination of disabled individuals, we do not think Congress intended that the fulfillment of that objective be attained at the expense of the safety of the general public. Our decision today does not deprive disabled individuals, who suffer discriminatory treatment at the hands of

law enforcement personnel, of all avenues of redress because Title II does not preempt other remedies available under the law. We simply hold that such a claim is not available under Title II under circumstances such as presented herein.

*Id*. at 801.

In *Thompson v. Williamson Cty., Tennessee*, 219 F.3d 555 (6th Cir. 2000), a man called 911 requesting assistance because his mentally handicapped brother was threatening their father with a machete. When officers arrived at the scene, they were informed that Thompson had disappeared into the woods behind the residence. The officers could not find Thompson and told the family that they would return if needed. Later on, Thompson's brother called 911 again stating that he had returned to the home with two machetes. One of the officers returned to the home, carrying his shotgun with him as he walked toward the house. Thompson's brother told the officer that Thompson was behind the house. When the officer attempted to look behind the house, Thompson saw him and began coming toward him with both machetes. The officer ordered Thompson to drop his weapons, but Thompson did not comply and raised one of the machetes as if to throw it. The officer shot and killed him. *Id*. at 556. The Sixth Circuit reasoned that ADA Title II was not implicated under these circumstances because the decedent was not discriminated against *because* of his disability:

> The record indicates that when the Thompsons called 911, they requested and received police assistance. Although they wanted their son taken to a medical facility, it would have still been necessary for Gooding to disarm the decedent before he could be transported anywhere. Gooding's failure to disarm, or take the decedent under control, was not because he was inadequately trained to deal with disabled individuals, but because the decedent threatened him with a deadly weapon before he could subdue him. Thus, if the decedent was denied access to medical services it was because of his violent, threatening behavior, not because he was mentally disabled.

*Id*. at 558.

At least one other district court in this Circuit has adopted the reasoning of *Hainze* and

11

*Thompson* with regard to reasonable-accommodation-during-arrest claims under the ADA. *See Sudac v. Hoang*, 378 F. Supp. 2d 1298, 1303-1306 (D. Kan. 2005).

Like the *Hainze* case, the officers in this case were faced with a situation where they had not yet secured the scene or ensured that there was no threat to human life. Plaintiff clearly posed an immediate danger to officers on the scene, himself, and others. Plaintiff was armed with a large knife and had already reportedly assaulted his brother with it. Plaintiff further refused to comply with many orders to drop the knife, and used taunting and threatening hand gestures toward officers. After the incident, Larry Clark prepared a Voluntary Statement wherein he described Plaintiff as presenting "a danger to himself and others." Defendant Dorr considered Plaintiff to be a threat to officers on the scene, himself, and others in the vicinity while he had the knife in his possession. Dorr was concerned that Plaintiff could have left the porch at any moment which would have created a more dangerous situation. Deputy Lively viewed Plaintiff as a danger to himself and to the officers on the scene. He could have quickly gotten to any of the officers with the knife or he could have easily harmed himself with it. He was also just two steps away from the cottage and could have gotten into the cottage before officers could have gotten to him. The officers had no idea what was inside the cottage. Deputy Hathcoat believed that Plaintiff was a threat. BAPD Captain DuFriend also believed that Plaintiff was a direct threat to officers on the scene and others in the vicinity. "To require the officers to factor in whether their actions are going to comply with the ADA, in the presence of exigent circumstances and prior to securing the safety of themselves, other officers, and any nearby civilians, would pose an unnecessary risk to innocents." *Hainze*, *supra*.[1]

---

[1] Some courts have disagreed with the rationale employed in *Hainze*, holding that the exigency of the circumstances presented by police interactions with citizens engaged in criminal activity has more of a bearing on the reasonableness of the accommodations in such circumstances than whether the ADA applies in the first instance. *See*, *e.g.*, *Bircoll v. Miami-Dade County*, 480 F.3d 1072, 1085

Furthermore, like the *Thompson* case, there is no evidence in this case that Plaintiff was discriminated against because of his disability, but rather that he suffered such treatment because he had a knife and posed an immediate threat to officers, himself, and others. Plaintiff's mental health status was not a primary concern of Deputies Hathcoat and Lively and Defendant Dorr in their interactions with Plaintiff at the scene. Rather, they were faced with an immediate threat situation where it had been reported that the suspect had assaulted his brother with a knife, where he had a knife, and where he would not comply with orders to drop the knife. In that specific scenario, the officers' primary concern was disarming and detaining him in order to eliminate the immediate threat he posed. In that regard, the officers did not treat Plaintiff differently than any other similarly situated suspect without a mental disability. Likewise, Captain DuFriend testified that Plaintiff's mental health status was not a significant factor in his treatment of Plaintiff and would not have made any difference because he was under arrest for a felony crime, he was noncompliant and armed, and he continued to pose a threat to officers and others.  As such, Plaintiff simply cannot demonstrate that he suffered "greater injury or indignity" in the arrest process than other arrestees without disabilities as necessary to make out a claim under the "reasonable-accommodation-during-arrest" theory of liability. *Gohier*, *supra*.

Plaintiff argues that the presence of exigent circumstances is a fact question for resolution by a jury and, therefore, summary judgment on his ADA claim is inappropriate. However, whether the ADA is even applicable in the first instance in light of the undisputed facts of the case is a question for the Court. *See Sudac v. Hoang*, 378 F. Supp. 2d 1298, 1303-1306 (D. Kan. 2005).  The Court adopts the rationale of *Hainze* and *Thompson* and finds that the "reasonable-accommodation-during-arrest" theory of liability under the ADA does not apply

(11th Cir. 2007). However, this is a distinction without a difference in the instant case and  the same results are directed under either rationale. *See Haberle v. Troxell*, 5:15-CV-02804, 2016 WL 1241938, at *12 (E.D. Pa. Mar. 30, 2016).

under the undisputed facts of this case.

Even if this Court did not adopt the rationale of *Hainze* or *Thompson* and instead found that the ADA did apply, Defendant Board would still be entitled to summary judgment with regard to Plaintiff's ADA claim. Plaintiff claims Defendant Board "failed to implement adequate policies and proper training to accommodate the needs of mental health patients during a police-citizen encounter..." [Dkt. 4, p. 13, ¶ 52].[2]  However, Plaintiff cannot demonstrate the county policymaker was deliberately indifferent with regard to either the alleged failure to enact adequate policies or provide adequate training. *See J.V. v. Albuquerque Public Schools*, 813 F.3d 1289, 1298 (10th Cir. 2016) (Tenth Circuit relies upon "deliberate indifference" analysis provided by 42 U.S.C. § 1983 jurisprudence in addressing failure-to-train ADA claims).

There are limited circumstances where inadequacy in training can be a basis for § 1983 liability. *City of Canton v. Harris*, 489 U.S. 378, 387, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 131 S.Ct. 1350, 1359, 179 L.Ed.2d 417 (2011) (citation omitted). Inadequacy in training may serve as the basis for municipal liability "only where the failure to train amounts to deliberate indifference..." to citizen rights. *City of Canton*, 489 U.S. at 388. "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality...can a city be liable for such a failure under § 1983." *Id.* at 389. To establish deliberate indifference to a need for training, Plaintiff must show that the Defendant knew of and disregarded the substantial risk of inadequate training of its employees. *Canton*, 489 U.S. at 388.

---

[2]It should be noted that, pursuant to Oklahoma law, Defendant Board  has no policy-making authority regarding the operation of the County Sheriff's Office or the supervision and training of Sheriff's Office employees. Rather, the County Sheriff is the official with such final policy-making authority. *See Meade v. Grubbs*, 841 F.2d 1512, 1528 (10th Cir. 1988); *Jantzen v. Hawkins*, 188 F.3d 1247, 1259 (10th Cir. 1999). As such, the policies and training discussed would be those provided by Defendant Sheriff Colbert. The Board is merely a nominal party to Plaintiff's ADA claims.

It isn't enough to "show that there were general deficiencies in the county's training program..." *Lopez v. LeMaster*, 172 F.3d 756, 760 (10th Cir. 1999). Rather, a plaintiff must "identify a specific deficiency" that was obvious and "closely related" to the injury at the basis of this lawsuit. *Id*.

Likewise, the failure to adopt a policy or procedure on any given subject may serve as the basis for liability "only when the omission amounts to an intentional choice, not merely an unintentionally negligent oversight..." *Doe on Behalf of Doe v. Dallas Independent School Dist*., 153 F.3d 211, 217 (5th Cir. 1998) (citation and internal quotation marks omitted). Furthermore, "such an omission is equivalent to an intentional choice only where the entity has acted with deliberate indifference." *Id*. (citing *City of Canton v. Harris*, 489 U.S. 378, 390, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). To demonstrate that Defendant Board acted with deliberate indifference in this regard, Plaintiff must show the Board intentionally failed to adopt such a policy with actual knowledge that the failure would very likely result in the violation of citizen's rights. *Berry v. City of Muskogee*, 900 F.2d 1489, 1496 (10th Cir. 1990). Furthermore, it is not adequate to show there was a "mere possibility" that such violations would occur as a result of the failure to adopt such a policy. Rather, Plaintiff is required to show that there was a "strong likelihood" that the omission of such a policy would result in such harm. *Watts v. Laurent*, 774 F.2d 168, 172 (7th Cir. 1985) (citations omitted). Moreover, the failure to enforce a prophylactic policy imposing a standard of care well in excess of what the ADA requires is not enough to create a triable question in regard to whether county officials were deliberately indifferent to the Constitution. *See Porro v. Barnes*, 624 F.3d 1322, 1329-30 (10th Cir. 2010).

> The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm...In most instances, notice can be established by

15

proving the existence of a pattern of tortious conduct...In a "narrow range of circumstances," however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a "highly predictable" or "plainly obvious" consequence of a municipality's action or inaction, such as when a municipality fails to train an employee in specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations.

*Barney v. Pulsipher*, 143 F.3d 1299, 1307-08 (10th Cir. 1998) (citations omitted).

In this case, the WCSO had a Conduct and Behavior policy which prohibited employees from discriminating against any person on the basis of disability. The WCSO had a Use of Force Policy which provided that "the protection of human life is the highest priority of the agency, that officers are responsible for the protection of the lives of citizens, fellow officers and themselves, and that all other duties are subservient to the duty to protect human life." The policy provided that "officers shall only use force that is objectively reasonable and necessary in the performance of their duties and that the reasonable level of force is to be determined by the circumstances of a particular situation." The policy provided that deadly force may only be used when an officer "has probable cause to believe that a suspect poses a significant threat of death or serious physical injury to others or the officer, and that all lesser threats must addressed with non-deadly force." The policy further contained definitions of levels of resistance and control, and specific procedures for the use of force, including escalation and de-escalation of force. Furthermore, Deputies Hathcoat and Lively and Defendant Dorr are all CLEET certified and receive a minimum of two hours of mental health training a year as a requirement of continued CLEET certification. In his training, Defendant Dorr was taught about how to recognize the signs of mental illness, to use de-escalation techniques when dealing with the mentally ill, to use soft words and non-threatening language when dealing with the mentally ill, and about the prevalence of mental illness in society.

Plaintiff has failed to show how these policies and training are inadequate to protect the federal rights of disabled citizens and has failed to specify what sorts of policies or training would be adequate.  Plaintiff has also failed to show any causal link between the alleged failure to implement such policies and training and his injuries. Moreover, Plaintiff has failed to show that the Sheriff acted with deliberate indifference in failing to implement such policies or training. There is no evidence in this case of any prior pattern of similar incidents which would have placed the county policymaker on notice of the need for additional or different policies or training. Nor is the violation of the federal rights of disabled citizens a highly predictable or plainly obvious consequence of the failure to implement such unspecified policies or training. Plaintiff has no evidence that the Sheriff acted deliberately in failing to implement unspecified policies and training, or that such failure was anything more than unintentional, negligent oversight. Accordingly, Plaintiff cannot demonstrate deliberate indifference on the part of the Sheriff with regard to the alleged failure to implement adequate policies and training and summary judgment on his ADA claim is granted..

Plaintiff argues that the WCSO's Conduct and Behavior policy "requires police to treat everyone equally regardless of their 'mental handicap'" and that, therefore, "there was a 'strong likelihood' that the omission of a policy requiring accommodation would result in a violation of the ADA." [Dkt. 110, pp. 24-25].  However, Plaintiff's assertion in this regard is not supported by a plain reading of the policy's text.  The policy does not require officers "to treat everyone equally regardless of their 'mental handicap'" as Plaintiff asserts.  Rather, it requires officers to "to provide the highest level of police service to all citizens without regard to...mental handicap." [Dkt. 95-26, p. 1].  This language does not prohibit officers from considering a citizen's mental handicap in providing services, but rather prohibits them from providing lesser

quality services based on such a handicap.  Plaintiff further argues that "a strong likelihood exists that enforcement of the [WCSO's Use of Force] policy will violate the ADA because the policy never instructs employees to consider or account for a person's mental health condition." [Dkt. 110, p. 25].  However, while the Use of Force policy does not specifically instruct WCSO employees to consider a person's mental health condition, it does provide that "[t]he reasonable level of force should be determined by the circumstances of a particular situation" [Dkt. 95-27, p. 3], which would necessarily include a suspect's mental health condition.  As such, Plaintiff's argument that there was a high likelihood that an ADA violation would result from these policy provisions is  unwarranted and unsupported.

Plaintiff further fails to specify what accommodations he should have been afforded during the arrest process itself. Defendant Dorr called in for less-lethal measures and officers attempted to communicate with him and get him to surrender the knife for nearly an hour before the deployment of the pepperballs. These are reasonable accommodations under the circumstances. Plaintiff mentions the possibilities of calling in a crisis intervention team or simply waiting him out. However, neither the WCSO nor the BAPD had a crisis intervention team at the time of the incident.  The BAPD had a few officers who had received additional training in dealing with individuals with mental health issues. However, Captain DuFriend did not advise the Sheriff or any other WCSO personnel of the existence or availability of such officers. Furthermore, Captain DuFriend made the decision not to attempt to wait Plaintiff out any further as officers had been on the scene for nearly an hour and had made no progress in communicating with Plaintiff or convincing him to surrender the knife.  Regardless, Plaintiff simply has no evidence - other than pure speculation - that calling in a crisis intervention team or simply waiting him out would have been effective strategies or would have ultimately yielded

any different results than what occurred. As such, Plaintiff simply cannot demonstrate that he suffered "greater injury or indignity" in the arrest process than other arrestees without disabilities as necessary to make out a claim under the "reasonable-accommodation-during-arrest" theory of liability. *Gohier*, *supra*.

> To say that officers should have taken certain other actions during the standoff is to lean far in the direction of impermissible hindsight...
>
> First, it would be unclear to officers which of plaintiff's various alternatives they would be required to pursue. Officers would be second-guessed for pursuing one over the other, on grounds that there was always something more or different that could have been done.

*Waller ex rel. Estate of Hunt v. Danville, VA*, 556 F.3d 171, 175-176 (4th Cir. 2009) (citing *Hainze*, *supra*. at 801-802). Accordingly, for the reasons set forth above, the Defendant Board is entitled to summary judgment with regard to Plaintiff's ADA claim.

## B. Plaintiff's State Law Negligence Claim

Plaintiff's state law negligence claim against Defendant Board is governed by the Oklahoma Governmental Tort Claims Act ("OGTCA"), Okla. Stat. tit. 51, § 151, *et seq*. The OGTCA is the exclusive remedy by which an injured plaintiff may recover against an Oklahoma governmental entity in tort. *Fuller v. Odom*, 741 P.2d 449, 451 (Okla. 1987); *see also* Okla. Stat. tit. 51, § 153(B). In the OGTCA, Okla. Stat. tit. 51, § 152.1(A), the legislature adopted and reaffirmed sovereign immunity for the State, its political subdivisions, and all employees acting within the scope of their employment. This immunity is subject to a limited waiver to the extent and the manner specifically provided for by the provisions of the other sections of the Act. Okla. Stat. tit. 51, § 152.1(B).

The exact basis for Plaintiff's negligence claim is unclear. Plaintiff alleges that "the use of force supervised by, orchestrated, and set in motion by Colbert and Dorr was objectively

unreasonable..." [Dkt. 4, p. 19, ¶ 82]. However, to the extent that Plaintiff's negligence claim is premised upon Defendant Sheriff Colbert's and/or Defendant Dorr's alleged formulation of a plan for disarming Plaintiff and taking him into custody and the supervision of other officers with regard thereto, Defendant Board is immune from suit pursuant to Okla. Stat. tit. 51, § 155(5) of the OGTCA, which preserves governmental immunity with respect to discretionary acts such as the supervision of employees. *Carlson v. City of Broken Arrow*, 884 P.2d 1209, 1212 (OK CIV APP 1994); *Ochoa v. Taylor*, 635 P.2d 604, 608 (Okla. 1981) ("[t]he Act specifically exempts political subdivisions from liability in the failure to exercise discretionary functions."). The formulation of a plan for disarming and taking Plaintiff into custody is a planning-level discretionary function protected by § 155(5). *See Randell v. Tulsa Independent School Dist. No. 1*, 889 P.2d 1264, 1267 (OK CIV APP 1994) ("Protected discretionary functions include the policy making and planning decisions, although not negligent performance of the policy."). Additionally, as discussed above there is simply no evidence that either Sheriff Colbert or Defendant Dorr was responsible for formulating any such plan. Rather, it was BAPD Captain DuFriend who formulated the plan to subdue and detain Plaintiff, and who issued all directives in carrying out the plan.

Likewise, the supervision of other officers in carrying out that plan is also a discretionary function protected by § 155(5). In *Elizabeth S. v. Oklahoma City Public Schools*, No. CIV-08-105-M, 2008 WL 4147572 (W.D.Okla. Sept. 3, 2008)(unpub) the plaintiff asserted negligence against a school district and school officials, alleging that defendants failed in their duty to supervise a teacher who assaulted a student and that defendants were negligent in retaining the teacher. The court determined that these negligence claims (i.e., negligent hiring and retention) were based upon the school district and its employees' performance of or failure to perform

discretionary acts and that § 155(5) applied to immunize the school district from the plaintiff's claims regarding negligence in supervising and retaining its employee. *Id.* at *5. *See also Burns v. Holcombe*, No. 09–CV–152–JHP, 2010 WL 2756954, at *13 (E.D. Okla. July 12, 2010) ("The language of the GTCA as well as recent case law construing these provisions makes clear the state and/or a political subdivision is not subject to suit for discretionary acts such as hiring, supervising, and training employees...") (unpub); *Fumi v. Bd. of Cty. Comm'rs of Rogers Cty.*, No. 10-CV-769-TCK, 2011 WL 4608296, at *6-7 (N.D. Okla. Oct. 3, 2011) (unpub); *White v. City of Tulsa, Okla.*, No. 13-CV-128-TCK-PJC, 2013 WL 4784243, at *5 (N.D. Okla. Sept. 5, 2013) (unpub).

Furthermore, to the extent that Plaintiff's negligence claim is premised upon City of Broken Arrow Sergeant Blevins' use of the pepperball launcher against him[3], the Defendant Board is further immune from suit pursuant to Okla. Stat. tit. 51, § 155(18) which provides tort immunity for an "act or omission...of a person other than an employee of the state or political subdivision at the time the act or omission occurred." Plaintiff argues that, pursuant to Okla. Stat. tit. 11, § 34-103(B) and Okla. Stat. tit. 21, § 99a, the Board assumed responsibility for the actions of Broken Arrow police officers at the scene. However, neither of those statutes supports Plaintiff's argument in that regard.

Okla. Stat. tit. 11, § 34-103 does not apply to the facts of this case. The statute sets forth circumstances under which municipal law enforcement officers may act as law enforcement officers outside the investigatory and territorial jurisdictional limits of their employing

---

[3]Plaintiff has expressly disclaimed the handcuffing by Defendant Dorr, the use of Tasers by Broken Arrow officers Wylie and Gibson, or the gunshots by Deputies Hathcoat and Lively and Broken Arrow Officer Smith, as a basis for any claim herein. [Dkt. 110, p. 28, n1]. Furthermore, there is no evidence that Defendant Sheriff Colbert used any force against Plaintiff himself. This leaves the use of the pepperball launcher against Plaintiff by Sergeant Blevins as the only possible basis for a use of force negligence claim.

municipality.  Subsection B of the statute permits municipal officers to act outside of their municipal jurisdiction at the request of a county sheriff to act as a law enforcement officer for the sheriff's office.  However, that is simply not the scenario involved in this case.  There is no evidence that the Sheriff requested any municipal officer to act as "law enforcement officers for the sheriff's office" as contemplated by § 34-103(B).  Rather, the Sheriff merely requested back-up from a neighboring law enforcement agency pursuant to Okla. Stat. tit. 21, § 99a(A)(4), which permits peace officers to act as a law enforcement officers outside of their jurisdiction "[i]n response to the request for assistance by a peace officer with investigatory or territorial jurisdiction."  Plaintiff has not cited to any legal authority holding that § 34-103 applies to the factual scenario of this case.  As such, § 34-103(B) is simply not implicated in this matter and has no bearing on liability.

Furthermore, by its express terms, § 34-103(B) only applies where the requested "service has been authorized by prior resolution by the governing body of the municipality where such officers are regularly employed."  However, Plaintiff has failed to cite to any evidence of any such prior resolution of the governing body of the City of Broken Arrow authorizing any such service.[4]  As such, Okla. Stat. tit. 11, § 34-103(B) provides no support for Plaintiff's argument.

While Okla. Stat. tit. 21, § 99a does appear to apply to the facts of this case, it does not support Plaintiff's assertion that "an agency requesting mutual aid assumes responsibility for the

---

[4]

Plaintiff improperly attempts to shift his evidentiary burden to demonstrate that § 34-103(B) applies by asserting that "[T]here is no evidence or allegation that the Broken Arrow officers were acting independently and without authorization from the City Council to respond to calls for mutual aid." [Dkt. 110, p. 19, n2].  In that regard, there was an "Agreement Between County and Municipality for Cooperative Law Enforcement Efforts" between Wagoner County and the City of Broken in place at the time of the subject incident.  However, the Agreement was for the purposes of facilitating deputization of certain members of the BAPD's Street Crimes Unit by the Sheriff to aid in the suppression of drug-related criminal activity.  BAPD officers at the scene of the subject incident were not there pursuant to the authorization of the Agreement. (See Dkt. 126-1; Dkt. 126-2, DuFriend Depo., p. 17:20 - p. 19:21).

responding officers." [Dkt. 110, p. 29].  Subsection B of the statute only delineates the limits of

the powers and duties of peace officers in certain enumerated circumstances – it does not provide

for liability or legal responsibility for the actions of an officer who responds to a request for

mutual aid by the requesting law enforcement agency as Plaintiff contends.  This is clear when

comparing the relevant language of Okla. Stat. tit. 11, § 34-103(B) and Okla. Stat. tit. 21, §

99a(B).  Okla. Stat. tit. 11, § 34-103(B) provides, in relevant part:

> While so serving, such police officers shall have the same powers and duties as
> though employed by the requesting law enforcement agency and when so acting
> they **shall be deemed to be acting within the scope of employment** of the
> requesting law enforcement agency... (emphasis added).

By contrast, Okla. Stat. tit. 21, § 99a(B) provides, in relevant part:

> While so serving as peace officers of the State of Oklahoma and rendering
> assistance under the circumstances enumerated above, peace officers shall have
> the same powers and duties as though employed by and **shall be deemed to be
> acting within the scope of authority** of the law enforcement agency in whose
> or under whose investigatory or territorial jurisdiction they are serving.
> (Emphasis added).

That the Oklahoma legislature chose to use the phrase "scope of authority" rather than

"scope of employment" in § 99a(B) demonstrates that the statutory provision is merely meant to

set forth the jurisdictional authority of assisting officers, not to assign legal liability for the acts

of such officers to the law enforcement agency requesting assistance.  A plain reading of the

statute simply does not support Plaintiff's argument that an agency requesting mutual aid

assumes legal responsibility for the responding officers and Plaintiff has not cited to any legal

authority which supports his expansive interpretation of the statutory language.

Moreover, even if the Board were legally responsible for Sergeant Blevins' use of the

pepperball gun under either Okla. Stat. tit. 11, § 34-103(B) or Okla. Stat. tit. 21, § 99a, the use of

pepperball gun on Plaintiff was objectively reasonable under the factual circumstances. *See*

*Dawson v. Anderson County, Tex.*, 566 Fed.Appx. 369, 370-71 (5th Cir., May 6, 2014) (unpub); *see also Morales v. City of Okla. City*, 230 P.3d 869, 878-881 (Okla. 2010) (wherein the Oklahoma Supreme Court adopted the same "objective reasonableness" standard of care for state law negligence claims premised upon the use of force during an arrest as that used in federal § 1983 excessive force claims). Accordingly, for the reasons set forth above, Defendant Board is entitled to summary judgment with regard to Plaintiff's state law negligence claims.

## IV. CONCLUSION

Accordingly, the Court GRANTS Defendant Board of County Commissioners of the County of Wagoner's Motion for Summary Judgment [Dkt. 95].


**IT IS SO ORDERED THIS 18th day of July, 2017.**


James H. Payne
United States District Judge
Eastern District of Oklahoma

24